647 F.2d 1020
 7 Fed. R. Evid. Serv. 1839
 Thomas O. JACKSON and Mattie L. Jackson, Husband and Wife,
Oklahoma citizens, Plaintiffs-Appellants,
v.
Lewis Riley FLETCHER, a California citizen; Shay
Distributing Company, Inc., aCalifornia
corporation; and Protective Insurance
Company, an
Indianacorporation,
Defendants-
Appellees.
 No. 79-1543.
 United States Court of Appeals,
Tenth Circuit.
 April 20, 1981.
 
 Larry A. Tawwater, Lampkin, Wolfe, McCaffrey & Tawwater, Oklahoma City, Okl. (John Sushnik, Chastain, Heath & Sushnik, Oklahoma City, Okl. and Ray Vaughn, Vaughn & Stafford, Edmond, Okl., with him on the brief), for plaintiffs-appellants.
 Alex Cheek, Oklahoma City, Okl. (Noma D. Gurich with him on the brief), Cheek, Cheek & Cheek, Oklahoma City, Okl., for defendants-appellees.
 Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 The plaintiffs-appellants, Thomas O. Jackson and Mattie L. Jackson, seek review of a judgment based on an unfavorable jury verdict in which the plaintiff, Thomas O. Jackson, sustained physical injuries in an automobile which was demolished following a collision with a tractor-trailer combination driven by defendant-appellee, Fletcher. Jurisdiction exists by reason of diversity of citizenship. 28 U.S.C. § 1332.
 
 
 2
 This accident occurred on May 10, 1977 at an intersection in an outlying section of Oklahoma City. The defendant tractor-trailer truck driver had been proceeding west along 122nd Street and the collision occurred at the intersection of 122nd Street with Bryant. Plaintiff had been driving his passenger automobile south on Bryant Street, a through street. The tractor-trailer truck which was being driven by Fletcher, who had his wife and small son with him, was making delivery of frozen food for Shay Distributing Co., the owner of the tractor-trailer. The defendant, Protective Insurance Company, is the insurance carrier. One Hundred Twenty-Second Street is not a through street. There were no witnesses other than the principals, and they contributed very little. The speed of both vehicles is the product of estimates by so-called experts. However, other witnesses, including an unbiased one, the police officer, who was at the scene immediately after the accident, said that each of the vehicles was travelling 30 miles per hour at the time of impact. A sign showing a black cross and a yellow background, warning of the intersection, is posted on 122nd Street about 750 feet from the intersection. The posted speed limit on Northeast 122nd Street is 45 miles per hour. At the approach to the Bryant Street intersection on 122nd Street there is a warning of the presence of a stop sign ahead to westbound traffic. A stop sign controls not only westbound traffic but eastbound traffic as well on 122nd Street. Thus Bryant is a protected street and traffic on Bryant is not required to stop. The defendant truck driver claimed that he did stop and then proceeded forward at a rate of five miles an hour.
 
 
 3
 The area in question is generally rural; there are only a few houses in the vicinity and they are about a quarter of a mile from the intersection.
 
 Plaintiff's Testimony
 
 4
 The accident occurred at approximately 1:00 p. m. in the afternoon and the pavement was dry and the weather was clear. Jackson, the plaintiff, testified that when he was a few feet away from the intersection he recalled seeing a truck in the intersection and he thought he'd swerve to the right to avoid striking the truck and that's all that he remembered. The accident happened in a short period of time and Jackson was unable to remember whether he had time to put on his brakes.
 
 Testimony of Investigating Officer
 
 5
 The officer, Mr. Ted Mapes, came to the scene very soon after the collision. He fixed the point of impact from observation of the debris. His location of the point of impact was nine feet east of the west curb line of Bryant and approximately three feet south of the north curb line of 122nd Street. He testified that the truck driven by defendant Fletcher left approximately 20 feet of skid marks and from the point of impact travelled approximately 60 feet west, where it ran off the roadway into a ditch and travelled 126 feet up an incline where it came to rest turned over on its side. Mapes found no skid marks from the plaintiff's automobile. Based upon his determinations as to positions of the vehicles and his other observations Mapes testified that the speed of the Jackson vehicle at the time of the collision was approximately 30 miles per hour and the speed of the truck was likewise in the neighborhood of 30 miles per hour.
 
 Plaintiff's Expert
 
 6
 A physicist, Doctor Moody Coffman, was called by the plaintiff to investigate the accident. Dr. Coffman's testimony established that the truck did not stop at the stop sign which faced it. He testified that based upon his observation of the scene, photographs of the vehicles and information furnished by the investigating officer, his opinion was that the Jackson vehicle entered the intersection at a speed of between 21 and 48 miles per hour, and the truck entered the intersection at a speed of between 24 and 59 miles per hour. Additionally he testified that based upon his findings the Jackson vehicle was travelling .88 times as fast as the truck at the time of the collision. Coffman testified that in his opinion it was impossible for the truck to acquire the speed it had reached had it actually stopped at the stop sign; that the truck could not have stopped and then proceeded up the incline 186 feet in first gear, which was the gear which Fletcher maintained it was in at the time of the accident.
 
 
 7
 Testimony of Mr. Fletcher (the truck driver)
 
 
 8
 He said that he saw the stop sign and stopped. He did comment that it was not a good place to put a stop sign (at the bottom of a hill); that if there was too much truck traffic it could make it difficult for the truck to stop and then start back up hill again. His only knowledge of the accident, he said, was a small blur out of the corner of his eye. He heard a bang and then became unconscious. In interrogatories which were read to him during his cross-examination he had testified that he stepped on the brakes of his truck and tried to avoid the accident.
 
 Defendants' Experts
 
 9
 Defendants' experts were Dr. Craig Jerner, a metallurgist, and his assistant, one John Harcourt. Their testimony was based on experiments they conducted in which it was sought to disprove Coffman's theory that the truck did not stop. Fletcher had testified that he was driving a 1977 International tractor-trailer which was brand new and in perfect condition. With its load it weighed 69,000 pounds. The experiment was conducted with a 1977 International tractor which was approximately two years old and a trailer which was empty. The result was a difference of 37,000 pounds between the weight of the accident vehicle and the test vehicle. In addition the test vehicle had a different size engine. It had an eight cylinder engine as compared with the accident vehicle which had six cylinders. The person who made the test kept his foot on the accelerator all the way through the intersection, based on the point of impact as located by the defense experts rather than the point described by Mr. Mapes. No skid marks were made by the test vehicle although the officer had said that the truck left at least 20 feet of skid marks and no impact was made with the test vehicle such as was encountered by the accident truck when it struck the Jackson vehicle. In Jerner's opinion the cause of accident was Jackson's lack of attentiveness as he drove the vehicle. Neither Jerner nor Harcourt placed primary emphasis on Jackson's speed as the cause of the accident. Dr. Jerner estimated Jackson's speed at impact to have been 40 miles per hour, while Harcourt placed it at 45 miles per hour. Both men briefly mentioned the possibility that Jackson may have been going faster before impact. However, the primary thrust of their opinions was that Jackson had lacked attention as he approached the intersection and that due to inattention he had failed to see the truck moving slowly through the intersection. By the time he saw the truck it was too late for Jackson to avoid it.
 
 
 10
 Coffman, on behalf of Jackson, had said that the accident was caused from the fact that Fletcher drove the truck straight through the stop sign and the intersection; that he did not see the automobile coming until it was too late to stop and only then did he apply brakes.
 
 
 11
 Testimony of Defendants' Experts on the Experiment
 
 
 12
 The expert testimony regarding the experiments that were conducted came from Dr. Craig Jerner and his assistant, Mr. Harcourt. The experiments were designed to show the length of time that was required for the Fletcher vehicle to cross the intersection and to overcome the testimony of Dr. Coffman on behalf of the plaintiff that the truck did not stop. As shown before, the truck that Fletcher was driving at the time of the accident was a 1977 International tractor-trailer which was brand new, fully loaded, and weighed approximately 69,000 pounds. The Jerner-Harcourt experiment truck was a 1977 International tractor. It pulled an empty trailer as a result of which the weight differential was shown to be 37,000 pounds lighter than the equipment which was in the accident. The test vehicle at the time of the making of the test started in first gear from a stopped position near the stop sign, and accelerated at full power to the point of impact. As we noted before, the point of impact was in dispute; the defense experts placed it near the west edge of the intersection rather than near the middle of the intersection as determined by Officer Mapes. Consequently the test vehicle had a longer distance to accelerate than it would have had if the point of impact located by Officer Mapes had been the reference point. When the test vehicle reached the point of impact the driver removed his foot from the accelerator and steered the truck west up Northeast 122nd. No effort was made therefore to simulate the effect of a collision or the entering in a ditch 60 feet up 122nd. Dr. Jerner testified that the experiment vehicle went past the point at which the accident vehicle overturned but not in any ditch. At the conclusion of this testimony counsel for plaintiff moved to strike on the ground that an empty truck was being used. The court, however, denied the motion, saying that the difference between the vehicles went to weight of the testimony and not admissibility.
 
 
 13
 On cross-examination Dr. Jerner testified that he seriously doubted that it would make any difference that the experiment truck was steered and remained on the pavement rather than travelling up the ditch for all the distance that the accident vehicle travelled. Further he testified that it would make no difference that the truck had made 20 feet of skid marks prior to impact. Harcourt also testified that the accident vehicle would have moved forward up Northeast 122nd in first gear without acceleration even if the truck had left 20 feet of skid marks or had entered the ditch.
 
 
 14
 As described above Coffman testified that it was not physically possible for the truck to have gone more than 40 feet up 122nd Street if it had been going ten miles per hour on impact. Dr. Coffman also testified that a tractor-trailer of this type will move forward in first gear without acceleration only on level ground where there are no impediments; that it would stall under these conditions as it headed uphill.
 
 I.
 
 15
 Alleged Error in Instructing the Jury on the Issue of Speed
 
 
 16
 The trial court gave several instructions dealing with the issue of speed. Each of these will be set forth and will be commented upon.
 
 
 17
 Most of these speed instructions were verbatim statements as to the provisions in the Oklahoma City ordinances. One was a state statute. Oklahoma City ordinance § 34-35 provides as follows:
 
 
 18
 No person shall drive a vehicle at a speed greater or less than is reasonable or prudent under the conditions then existing, taking into consideration, among other things, the conditions of the vehicle, roadway and weather, the amount of light and darkness, the amount of traffic, presence of pedestrians in or near the roadways and the obstruction of view.
 
 
 19
 An Oklahoma statute is concerned with this. Its subject matter is as follows:
 
 
 20
 47 O.S. § 11-801(a): Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard for the traffic, surface and width of the highway and any other conditions then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop with the assured clear distance ahead.
 
 
 21
 The theme of both instructions is that the operator of a vehicle must drive at a reasonable and prudent speed under the conditions. There are some differences. The ordinance, for example, mentions special surrounding conditions which are to be considered. No doubt the trial court believed that although these have similarity, that both should be given; we do not find fault with that decision.
 
 
 22
 The next one to be considered is Oklahoma City ordinance § 34-35.01, which reads:Notwithstanding the posted speed limits it shall be an offense for any person to drive a vehicle in a residential district at an excessive speed, without having due regard for the safety of persons or property or without taking into consideration the condition of the vehicle, the roadway or the weather; or the amount of light or darkness; or the amount of traffic; or the presence of pedestrians in or near the roadway; or any view obstruction.
 
 
 23
 This is another instruction which deals with the same problem, namely precautions in the light of conditions. However, it deals with posted speed limits and says that notwithstanding the posted speeds, that it is unlawful to drive a vehicle in a residential district at an excessive speed. It then goes on in a companion provision to define what constitutes a residential district and declares:
 
 
 24
 The territory contiguous to and including a highway not comprising a business district when the property on such highway for a distance of three hundred (300) feet or more is in the main improved with residences or residences and buildings in use for business.
 
 
 25
 Counsel for defendants-appellees maintain that inasmuch as the ordinances of Oklahoma City apply citywide that the ordinances are applicable even in an area where there are posted speeds set forth along the highway, such as here. But that is not what this ordinance provides. There is a distinction given between an area which is residential and one which is not residential. The ordinance states that where the property on the highway for a distance of 300 feet or more is in the main improved with residences or residences and buildings used for business, it is a residential district. The area that here is in question does not fit with this definition. Officer Mapes, who was the only witness on this subject, said that the area was rural in character and his other testimony indicates that there was only an occasional house at or near the highway and beyond. It must have been confusing to the jury to consider this in connection with the other instructions on speed, that is to say 47 O.S. § 11-801(a) and § 34-35. Thus it is our opinion that this particular instruction, pertaining as it does to residential districts, ought not to have been given.
 
 
 26
 Section 34-37 contained a prohibition in respect to the maximum and minimum speeds. The prohibition was against exceeding the maximum speed and going slower than the minimum speed. Although I do not see that this made any great contribution to the case, it doesn't appear to be erroneous.
 
 
 27
 We have previously noted that the experts gave their opinions as to the speed of each vehicle, that is, Dr. Coffman gave his opinion as did Dr. Jerner and his assistant. There was also testimony as to the skid marks. The testimony on each side was different. Therefore there was certainly an issue of speed in the case.
 
 
 28
 We have indicated disapproval of the instruction based upon § 34-35.01 of the Oklahoma City Ordinances which dealt with speed in a residential area. We are not, however, holding that the giving of this instruction was reversible error in and of itself.
 
 
 29
 Moreover, we do not hold that the failure of the court to give the definition of a through highway in accordance with § 1-175 of 47 O.S.A. constituted error. One good reason for this holding is that the plaintiff did not request such an instruction. Inasmuch, however, as the case is to be retried, we call attention to this definition and commend it to the trial court in connection with the retrial.
 
 
 30
 The court did give another instruction on the duty of a person entering from a stop street and this is the other side of the coin in relationship to the through highway instruction. The part of the instruction which is contained in the statute recognizes that the person on the highway has the preferential right-of-way.
 
 
 31
 The case of Townley's Dairy v. Creech, 476 P.2d 79 (Okl.1970) was emphasized by counsel for defendants on rehearing. It dealt with a problem not dissimilar from that which is here presented in that there was a collision between a truck which was on the through highway and a vehicle which was entering the through highway. The conditions, however, were different. A severe storm caused vision to be limited. The Oklahoma Supreme Court approved an instruction which said that the rights, duties and obligations of the drivers of the vehicles involved in the collision were reciprocal and further that it was the duty of each of said drivers as they approached the point where the collision occurred to exercise ordinary care in the management of his vehicle. The court went on to declare that it was the duty of each person to drive his vehicle at a reasonable rate of speed and under reasonable and proper control and that it was likewise the duty of each driver to use reasonable and ordinary care in keeping a lookout ahead consistent with the safety of other vehicles and persons who might be using and travelling upon such street or highway. The opinion by Justice Blackbird concluded as follows:
 
 
 32
 (A) 'favored' driver's right of way does not relieve him of the duty of exercising reasonable care and caution not to injure others at the intersection; and whether or not he has discharged this duty, like the question of whether the 'unfavored' driver who entered the intersection has discharged his duty of using due care under the circumstances (see Hansen v. Cunningham, 258 P.2d 906 (Okl.), quoting Wilkinson v. Marcellus, 51 Cal.App.2d 630, 125 P.2d 584, 586) is a question for determination by the trier of facts
 
 
 33
 476 P.2d at 83.
 
 
 34
 To a degree, at least, Townley contains potentially useful guides for the retrial of this case.
 
 II.
 
 35
 The Question as to Admissibility of the Out of Court Experiments
 
 
 36
 The objection to the admissibility of the experiment was due to the changed circumstances of the experiment. The circumstances of the experiment were different from that of the actual happening.
 
 
 37
 The first difference was the failure to have a vehicle of approximately the same weight as the accident vehicle. The weight differential was not the only variance between the actual happening and the simulated one. Another possible variance was that the test driver did not apply brakes as Mr. Fletcher's answers to interrogatories indicated he had done. Moreover, the test vehicle did not travel the same route. It did not pursue the ditch for 125 feet as did the accident vehicle.
 
 
 38
 The testimony of defendant was that it would make no difference that the truck had made 20 feet of skid marks prior to impact and that the test truck had travelled on the highway rather than in the ditch. We disagree. The route of the accident vehicle evidenced its momentum.
 
 
 39
 Dr. Coffman testified that in his opinion it was physically impossible for the truck to have gone more than 40 feet up 122nd if it had been going ten miles per hour on impact. Coffman also testified that a tractor of this type would move forward in first gear without acceleration only on level ground with no impediments; that such a tractor would stall under the simulated conditions if it was headed uphill.
 
 
 40
 Did the trial court err in allowing this experiment to be received in evidence with the variances?
 
 
 41
 We must hold that it did. The admissibility of experiments which are performed outside of the courtroom is controversial. However, it is generally within the discretion of the trial judge as to whether such evidence will be received or not and ordinarily such a ruling on admissibility or non-admissibility is not disturbed unless it is clearly a wrong ruling. The question is whether the variances of the experiment from the accident were prejudicial. Such testimony is not readily admissible unless the experiments are carried out in a substantially similar manner and not in a distorted way. See Collins v. B. F. Goodrich Company, 558 F.2d 908 (8th Cir. 1977); Ramseyer v. General Motors Corp., 417 F.2d 859 (8th Cir. 1969); Drake v. Tims, 287 P.2d 215 (Okl.1955). "A party offering evidence of out of court experiments must lay a proper foundation by showing a similarity of circumstances and conditions." Navajo Freight Lines v. Mahaffy, 174 F.2d 305, 310 (10th Cir. 1949).
 
 
 42
 The object of the rule which requires substantial similarity of conditions is to prevent admission of evidence which tends to mislead and perhaps confuse the jury. Fed.R.Evid. 403; Derr v. Safeway Stores, Inc., 404 F.2d 634 (10th Cir. 1968); Barnes v. General Motors Corp., 547 F.2d 275 (5th Cir. 1977).
 
 
 43
 Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court, from the nature of the experiments, that the jury will be enlightened, rather than confused. In many instances, a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence, and make it harmful, rather than helpful.
 
 
 44
 Navajo Freight Lines v. Mahaffy, supra at 310.
 
 
 45
 In a recent decision of the Oklahoma Supreme Court, Jones v. Stemco Manufacturing Co., Inc., 624 P.2d 1044 (Okl.1981), this rule that evidence of out of court experiments is admissible only where there is a showing of similarity of conditions was again affirmed and approved by the Oklahoma Court. In Jones the plaintiff had alleged that the cause of the truck accident was a defect in a hub seal, which defect allowed oil to leak from the axle. Defendants introduced evidence of an experiment designed to show that if the seal had leaked, substantially more oil would have been thrown into the wheel area than was actually present. Various differences between the accident vehicle and the test vehicle were shown as well as differences between the conditions under which the test vehicle was driven and actual conditions. The court vacated a jury verdict unfavorable to plaintiff and remanded for new trial.
 
 
 46
 In our case the experiment was not primarily to demonstrate physical principles which can be demonstrated on some occasions without a suggestion arising that the experiment simulates actual events. Millers' National Insurance Co., Chicago, Ill. v. Wichita Flour Mills Co., 257 F.2d 93 (10th Cir. 1958); Brandt v. French, 638 F.2d 209 (10th Cir. 1981). Where experiments such as this are not based on the facts, however, it must be made clear to the jury that the evidence is admitted for a limited purpose. Thus, where equipment failures are at issue in a case, experiments with the same make and model may be admissible to show normal wear and tear or normal operation. Ramseyer v. General Motors Corp., supra; Midwestern Wholesale Dry, Inc. v. Gas Service Co., 442 F.2d 663 (10th Cir. 1971). Similarly, experiments designed to demonstrate the effect of various types of exposure on a product or material may be admissible. C. F. Church Division of Radiator & Standard Sanitary Corp. v. Golden, 429 P.2d 771 (Okl.1977). Where, however, an experiment purports to simulate actual events and to show the jury what presumably occurred at the scene of the accident, the party introducing the evidence has a burden of demonstrating substantial similarity of conditions. They may not be identical but they ought to be sufficiently similar so as to provide a fair comparison. Barnes v. General Motors Corp., supra.
 
 
 47
 In the case before us it cannot be disputed that the truck and trailer which was driven by the defendant came to rest over 180 feet up Northeast 122nd Street. The exhibits and testimony established the truck travelled up a substantial incline. Moreover, the truck was carrying a load of frozen food and weighed approximately 69,000 pounds. Plaintiff's expert witness testified that it was impossible for the truck to have travelled up the incline 186 feet without acceleration if it had stopped at the stop sign. Defendants' theory was the truck had moved forward in first gear without acceleration and Mr. Harcourt testified that it was possible for this to occur. The experiment at issue here sought to simulate the actual chain of events, therefore, and thus to lend support to the testimony of defendants' experts as to how the accident happened.
 
 
 48
 It was essential to the defendants' theory of the case to convince the jury that the truck could have come to rest where it did without having to run the stop sign. The experts were at odds on this point. Under these circumstances, then, the jury could very well have attached great significance to the experiment. It is in precisely this type of case that the foundation requirement serves to insure that evidence which intends to distort the situation does not impair the fact-finding process. Substantial similarity of conditions is essential in a sensitive situation like the present one in order to avoid the risk that inaccurate or distorted results will cause the jury to be misled and to return a verdict which is based upon conclusions of fact that are contrary to what actually happened.
 
 
 49
 In the present case the conditions under which the experiment was conducted differ in significant respects from conditions present at the accident.
 
 
 50
 Here there is a physical situation on 122nd Street wherein the highway going in a westerly direction moves downhill substantially to the intersection. Similarly the highway which goes away from the intersection goes uphill. Thus a vehicle weighing 37,000 pounds less than the accident vehicle produces an unfair experiment. The test vehicle weighed 54% less than the accident vehicle and in a situation where there is a stop, there must be great difficulty in moving across the intersection and up the hill. This weight differential or disparity makes a vast difference. Furthermore, there was no effort to simulate the undisputed impediments to motion presented by collision and travel off the pavement. Failure to simulate the conditions could have produced a result desired by defendants but not a true depiction.
 
 
 51
 It cannot be denied that the conditions were different in significant ways. The substantial variance from the real happenings prevented a fair comparison. The differences between the experiment and the actual conditions cause concern that the jury could have been misled on a highly important element of the case. With this in mind we must conclude that receipt of this evidence was prejudicial to plaintiff-appellant.
 
 
 52
 There were other instructions regarding which the plaintiff has raised issues in his brief having to do with the damage award to Mr. Fletcher. In view of the fact that the cause is being reversed on other grounds and a new trial is being ordered, these matters can be addressed when the cause is retried. The same would be true of an instruction which defines the through highway.[1]
 
 
 53
 The judgment of the district court is reversed and the cause is remanded to the district court for a new trial consistent with the foregoing opinion.
 
 
 
 [1]
 Section 1-175 of the 47 O.S.A. provides: Every highway or portion thereof on which vehicular traffic is given preferential right-of-way, and at the entrances to which traffic from intersecting highways is required by law to yield right-of-way to vehicles on such through highway in obedience to such stop sign or a yield sign when such signs are created as provided
 The plaintiff did not request an instruction involving the definition or character of a through highway.