UNITED STATES of America, Plaintiff-Appellee,

v.

Elward Roe WANOSKIA, Defendant-Appellant.

No. 84–2105.

United States Court of Appeals, Tenth Circuit.

Sept. 5, 1986.

Jon T. Kwako, Albuquerque, N.M., for defendant-appellant.

William L. Lutz, U.S. Atty., and Jennifer A. Salisbury, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff-appellee.

Before LOGAN, SEYMOUR, and MOORE, Circuit Judges.

LOGAN, Circuit Judge.

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed.R. App.P. 34(a); Tenth Cir.R. 10(e). The cause is therefore ordered submitted without oral argument.

Defendant, Elward Roe Wanoskia, was convicted by a jury of second-degree murder pursuant to 18 U.S.C. §§ 1111 and 1153. The district court sentenced him to sixty years in prison. In this appeal defendant argues that: (1) the government's use of demonstrative evidence was prejudicial; and (2) his conviction violated his rights under the Equal Protection Clause because, had he not been an Indian, he would have been subjected to a lesser penalty under New Mexico state law.

On April 8, 1984, defendant's wife, Linda Martinez Wanoskia, was shot in the head and killed. The shooting occurred at approximately 1:30 a.m., after defendant, his wife, and their friend Erlinda Menarco had returned to defendant's Indian reservation home from an afternoon and evening of drinking. Both defendant and his wife were enrolled members of the Jicarilla Apache Tribe.

The government's version of how the death occurred was presented primarily through the testimony of Menarco. She stated that after returning home during the early morning of April 8, defendant began to beat his wife. Menarco tried to intervene, but defendant threw plants at her and then kicked her in the chin. Menarco testified that defendant next got his pistol and attempted to shoot Menarco, but his wife pushed his arm and the shot went through the window. After shooting at Menarco again, and again missing, defendant shot his wife in the head. Defendant then attempted again to shoot Menarco but the gun failed to fire. Then, according to Menarco, defendant threatened to kill her

unless she told the police that defendant's wife shot herself. This is in fact what Menarco first told the police. Later, however, she recanted and told the police that defendant had killed his wife and that she had lied out of fear of defendant.

Defendant's version was presented primarily through his own testimony. He testified that an argument began between his wife and Menarco shortly after their return home. When he tried to stop the argument, his wife struck him and then Menarco with a frying pan. Defendant testified that his wife then took his .357 revolver from the bedroom and threatened to shoot him. A scuffle ensued between Wanoskia, his wife, and Menarco. Eventually, his wife got control of the gun and after saying, "Watch this," shot herself in the head.

## I

At trial the government sought to show by expert testimony and a demonstration that defendant's wife did not shoot herself. The expert testimony related to the powder burns on the wife's face and how far away the pistol must have been when it discharged. The demonstration was to show that defendant's wife could not have held the weapon that far away from her face.

The government presented as a witness an FBI special agent with expertise in firearms identification who had performed a series of tests with defendant's revolver to determine the pattern of gunpowder particles and residue that the gun left when fired at different distances. The agent had fired the gun into sheets of cotton from varying distances; he testified to the patterns of gunpowder residue at the respective distances. The agent declined to testify as to how far the gun was from the victim when it was fired because he lacked expertise in examining gun powder residue left on human skin.

The government next presented Dr. John Smialek, chief medical investigator for the State of New Mexico in Albuquerque. Smialek, who performed the autopsy on Mrs. Wanoskia, testified that he found gun powder on the victim's face in a pattern with a nine inch diameter. Based on the earlier witness' test firings, Smialek estimated that the gun was eighteen inches from Mrs. Wanoskia when fired.

Smialek also stated that Mrs. Wanoskia weighed 171 pounds and was five feet two inches tall. He estimated the length of her arms to be between nineteen and twenty inches. He candidly admitted that he had neglected to measure her arms, but based his estimate on his experience with other women of similar weight and height and on his measurement of the arm length of two Hispanic women working in his office who were of similar weight and height. Defendant's objection to this estimate was overruled.

The government then sought to demonstrate that it was physically impossible for a woman with approximately twenty-inch arms to hold this particular gun eighteen inches from her head. The court would not allow the female assistant U.S. attorney who tried the case to perform the demonstration herself. A search began of the halls of the courthouse for a woman with twenty-inch arms. The defense attorney told the court that he had found one woman of similar height and weight to Mrs. Wanoskia, but she had twenty-four-inch arms. Eventually, a woman with twenty-four-inch arms was used as a model in the demonstration. In the first demonstration, the model held the revolver with her thumb on the trigger and pointed at her head. The distance from the muzzle to her face was twelve inches. Next, the model held the gun with her forefinger on the trigger. In this position, the distance from the muzzle of the gun to her face was roughly four inches. Finally, the model held the gun with both thumbs on the trigger. In this position, the distance from the muzzle of the gun to her face was eleven and three-quarter inches. Defendant objected to this demonstration and a similar one during the prosecution's rebuttal presentation.

■ Demonstrative evidence, and in particular, reenactments of events, can be highly persuasive. The opportunity for the

jury to see what supposedly happened can accomplish in seconds what might otherwise take days of testimony. By conveying a visual image of what allegedly occurred, one side can imprint on the jury's mind its version of the facts. *See generally Carson v. Polley*, 689 F.2d 562, 579 (5th Cir.1982); *McCormick on Evidence* § 215 (3d ed. 1984). Thus the court must take special care to ensure that the demonstration fairly depicts the events at issue. Nevertheless, a trial court's decision to admit or exclude such evidence will be reversed only if the court abused its discretion. *United States v. Hart*, 729 F.2d 662, 669 (10th Cir.1984).

In *Jackson v. Fletcher*, 647 F.2d 1020 (10th Cir.1981), we established a strict threshold requirement for the admission of experimental evidence. This standard is also appropriate for the admission of the demonstrative evidence in this case:

> "Where ... an experiment purports to simulate actual events and to show the jury what presumably occurred at the scene of the accident, the party introducing the evidence has a burden of demonstrating substantial similarity of conditions. They may not be identical but they ought to be sufficiently similar so as to provide a fair comparison."

*Id.* at 1027 (citations omitted); *accord United States v. Hart*, 729 F.2d at 669 (10th Cir.1984) (excluding admission of demonstrative hairpin absent evidence that it was comparable to hairpin actually used to open lock); *see also Randall v. Warnaco, Inc.*, 677 F.2d 1226, 1234, 1234 n. 7 (8th Cir.1982) (admission of experimental evidence "very close to a reenactment of the accident ... could be deemed unduly prejudicial"). Adhering to this standard in a criminal prosecution is even more important than in a civil case.

■ Defendant's primary challenge to the government's use of the demonstrative evidence is that there was insufficient evidence of his wife's arm length. The government and its expert medical witness clearly should have measured the victim's arms in the circumstances of this case.

Nevertheless, we hold that the expert was qualified to estimate her arm length. Measurement of two women in his office was an insufficient basis for his conclusion, but, as the district court held, the witness was competent to estimate the victim's arm length based on his medical expertise as an experienced medical pathologist.

That actual measurements were not taken affects the weight of the evidence, not its admissibility. *See Szeliga v. General Motors Corp.*, 728 F.2d 566, 567 (1st Cir. 1984) ("Dissimilarities between experimental and actual conditions affect the weight of the evidence, not its admissibility."); *Renfro Hosiery Mills Co. v. National Cash Register Co.*, 552 F.2d 1061, 1065 (4th Cir.1977) ("If there is substantial similarity, the differences between the test and the actual occurrence ordinarily are regarded as affecting the weight of the evidence rather than its admissibility."). The court properly instructed the jury to disregard the expert testimony if it believed the testimony lacked adequate foundation.

At this point it became incumbent upon the defense to rebut or impeach the expert's testimony through cross-examination or other expert testimony. *See Kehm v. Proctor & Gamble Manufacturing Co.*, 724 F.2d 613, 624 (8th Cir.1983). We note that defendant had available to him photographs of his wife and possibly articles of her clothing. If he seriously disputed the pathologist's estimates, he could have made his own estimates from these sources.

■ Defendant also challenges the relevancy of the demonstrations. We agree with the district court that they were relevant to the government's theory of how the shooting occurred. *Cf. Schleunes v. American Casualty Co.*, 528 F.2d 634, 637 (5th Cir.1976) (evidence of how weapon was fired generally admissible in suicide cases). The government presented testimony that defendant had told the police his wife pulled the trigger with her index finger, not with her thumb as he contended at trial. With the model's finger on the trigger, the demonstration showed that a woman with twenty-four-inch arms could only

hold the gun about four inches from her face. Thus, even if the pathologist's estimate of the victim's arm length was off by several inches, the demonstration showed that the victim could not have shot herself if she had her finger on the trigger.

We also note that the trial court took great care in ensuring that the demonstrations did not unduly prejudice defendant. Before permitting the demonstrations during the case-in-chief, the court viewed the demonstrations outside the presence of the jury. Only after being satisfied that these demonstrations were probative did the court permit them. In addition, the court intentionally had the demonstration performed by a woman with arms longer than the estimate of the expert witness. We find no abuse of discretion in the court's allowing the demonstrations. *See Hart,* 729 F.2d at 669.

Defendant also makes vague allegations that he was prejudiced because he did not have notice of the government's intent to conduct demonstrations. We find no prejudice in this respect. Defendant himself presented expert testimony concerning the distance between the gun and his wife when it was fired; he had to consider the length of his wife's arms if this evidence was to have any meaning.

## II

Defendant argues that his conviction violates his right to equal protection under the Fifth Amendment because the federal criminal statute under which he was sentenced to sixty years' imprisonment authorizes a more severe penalty than the comparable state statute. Under federal law a judge may sentence a defendant convicted of second-degree murder to "any term of years or for life." 18 U.S.C. § 1111. In contrast,

under New Mexico state law a judge may only sentence a defendant convicted of second-degree murder to a term of nine years, subject to increase or decrease for aggravating or mitigating circumstances. N.M. Stat. § 31–18–15. Defendant avers that as an Indian in Indian country he was subject to federal jurisdiction and the more severe penalty, while a non-Indian charged in the same circumstances would have been subject only to state jurisdiction and the lighter penalty.

To sustain a claimed denial of constitutional rights, defendant must demonstrate a legal injury. *United States v. Maestas,* 523 F.2d 316, 322 (10th Cir.1975). Defendant here was not subject to different treatment than that to which he would have been subject had he been a non-Indian. Defendant and his wife were both enrolled members of the Jicarilla Apache Tribe. The shooting of defendant's wife occurred on the Jicarilla reservation. A non-Indian charged with shooting defendant's Indian wife in Indian country would be subject to federal jurisdiction and the more severe federal penalty under 18 U.S.C. § 1152, just as defendant was under 18 U.S.C. § 1153. *Donnelly v. United States,* 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (affirming the federal conviction of a non-Indian for the murder of an Indian, pursuant to a predecessor to 18 U.S.C. § 1152).[1] Thus, defendant's equal protection challenge to the constitutionality of the federal scheme under which he was tried and found guilty must fail.

AFFIRMED.

---

**1.** *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), cited by the parties on the equal protection claim, involves disparate treatment of Indians and non-Indians when the victim is a non-Indian. *United States v. McBratney,* 104 U.S. 621, 26 L.Ed. 869 (1881), judicially created an exception to federal jurisdiction over crimes committed in Indian country, for crimes committed by non-Indians against other non-Indians. Although *McBratney* has been criticized, *see* F. Cohen, *Handbook of*

*Federal Indian Law* 264–66 (1982 ed.), the decision has been consistently followed by the Supreme Court in other cases involving crimes in Indian country by non-Indians against non-Indians. *Antelope,* 430 U.S. at 643 n. 2, 648 n. 9, 97 S.Ct. at 1397 n. 2, 1399 n. 9. In *Antelope* the Court dismissed disparate treatment concerns raised by its adherence to the *McBratney* precedent. *Id.* at 646, 97 S.Ct. at 1398 (federal regulation "is rooted in the unique status of Indians as 'a separate people' ").