**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert GASKELL, Defendant–Appellant.**

**No. 90–5958.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 25, 1993.

Roberta Fine, Key West, FL, for defendant-appellant.

Harriett R. Galvin, Linda Collins Hertz, Carol Herman, Asst. U.S. Attys., Miami, FL, for plaintiff-appellee.

Before KRAVITCH and BIRCH, Circuit Judges, and CLARK, Senior Circuit Judge.

BIRCH, Circuit Judge:

The defendant, Robert Gaskell, was convicted of involuntary manslaughter of his infant daughter in violation of 18 U.S.C. § 1112. He appeals his conviction, arguing that a government witness was allowed to conduct an unscientific and prejudicial demonstration of "shaken baby syndrome," using a model of an infant. Gaskell also contends that the district court improperly excluded the testimony of a defense expert witness and erroneously instructed the jury on the required elements of proof for involuntary manslaughter. We REVERSE Gaskell's conviction.

## I. BACKGROUND

Robert Gaskell was the father of Kristen Gaskell, who was born on July 7, 1989. Beginning in September, 1989, Kristen had a series of problems with her health, including fevers and vomiting. On at least four occasions prior to her death, Kristen was treated for recurring vomiting, either in an emergency room or after admission as a hospital patient.

On February 10, 1990, Kristen vomited again and was cleaned up by Gaskell and Kristen's mother, Diane Gaskell. Shortly thereafter, Diane left to go shopping, leaving Kristen in Gaskell's care. That day, at approximately 4:55 p.m., the Gaskells' neighbors, Janet and Scott Young, returned home from the circus. Both Janet and Scott were certified as emergency medical technicians. Scott testified that as they arrived home, Gaskell ran out of his open door yelling that Kristen was not breathing. Janet and Scott attempted to revive Kristen. Both testified that Kristen appeared pale, with the blue skin tint associated with a lack of oxygen. Both testified that there was vomit on the rug and in Kristen's mouth and nose, and that the odor of a baby's vomit was discernable around Kristen. Janet removed a small amount of white, milky fluid from Kristen's mouth using a turkey baster. Using procedures modified for infants, Janet and Scott performed cardiopulmonary resuscitation ("CPR") on Kristen. Shortly thereafter, emergency medical technicians arrived and continued the attempt to revive Kristen. Kristen was pronounced dead at approximately 6:01 p.m. on February 10th.

At trial, both the government and the defense presented expert medical testimony regarding the cause of Kristen's death. Dr. Robert John Nelms, the Medical Examiner for Monroe County, Florida, performed an autopsy on Kristen on the day following her death. Dr. Nelms testified that Kristen did not die of asphyxiation. He observed what he characterized as a "ligature" mark on Kristen's neck as well as

signs of internal trauma indicating a head injury. He concluded that Kristen had died either as the result of strangulation or from being struck on the head with some object. Dr. Roger Mittleman of the Dade County Medical Examiner's Office also testified for the government. Dr. Mittleman disagreed with some of Dr. Nelms's conclusions. He testified that the "ligature" mark was merely a skin rash and that Kristen most likely had died of "shaken baby syndrome," a category of internal head trauma. Dr. Mittleman testified that forcefully shaking an infant can result in fatal injury because of the delicacy of an infant's brain and the inability of the undeveloped muscles in an infant's neck to restrain the movement of its head.

Over the objection of defense counsel, Dr. Mittleman was allowed to conduct a demonstration of shaken baby syndrome by manipulating a rubber infant mannequin used to practice infant CPR techniques. Dr. Mittleman forcefully shook the doll before the jury so that the head repeatedly swung back against the doll's back and then forward onto the doll's chest. He testified that the neck of the CPR doll was stiffer than an infant's and, thus, greater force was required to produce the head movement associated with shaken baby syndrome. Dr. Mittleman added that the degree of force required was "above and beyond what we consider child care. We are all taught to support the baby's head." R6–23.

Dr. Glenn Wagner, the Assistant Armed Forces Medical Examiner at the Armed Forces Institute of Pathology and a specialist in pediatric pathology, testified for the defense. Dr. Wagner concluded that Kristen did not asphyxiate as a result of vomiting, but had died of internal head trauma suggestive of shaken baby syndrome. He added that the injuries could have been inflicted if Gaskell had panicked, reached down into the playpen and quickly lifted Kristen by her arms. On cross-examination, he stated that Kristen's injuries would require forceful shaking, but that he could not determine whether the injuries resulted from a panicked attempt to revive Kristen or from deliberate child abuse. Dr. Bruce McIntosh, a pediatrician at St. Vincent Medical Center in Jacksonville, Florida, also testified for the defense. He concluded that Kristen had been shaken in a misguided attempt to revive her and that her injuries were consistent with shaken baby syndrome.

Gaskell was not allowed to present the testimony of Linda Certa, Director of the Community Services Board of Prince William County Virginia. Certa is the director of a national program designed to educate parents, caretakers, and hospital personnel about shaken baby syndrome. Gaskell's counsel represented that Certa would testify as to the lack of knowledge on the part of many parents regarding the dangers of shaking an infant. Further, counsel stated that Certa would testify that she was familiar with cases in which a parent attempted to resuscitate an infant by shaking and that this practice was at one time medically recommended. Gaskell also sought the introduction of a videotape used by Certa to inform parents about shaken baby syndrome. The trial court excluded Certa's testimony and the videotape on the ground that this evidence was cumulative of other testimony. Further, the court ruled that the testimony as proffered was irrelevant because it would involve other cases of shaken baby syndrome and would not be probative of Gaskell's mental state.

Gaskell testified in his defense. He stated that he had left Kristen alone for about five minutes while he was in the bathroom. When he returned, Kristen was not breathing and was covered in vomit. He testified that he had picked her up "real quick" and had shaken her in an attempt to resuscitate her. R7–151–52.

Following argument by counsel, the trial court instructed the jury on the elements of second-degree murder and the lesser, included offenses of voluntary and involuntary manslaughter. With regard to involuntary manslaughter, the court charged the jury regarding the elements of proof as follows:

Number one, again, that Ms. Gaskell, Kristen, was killed as a result of an act by the defendant.

Number two, that in the circumstances existing at that moment, at that time, the defendant's act either was by its nature dangerous to human life or was done with a reckless disregard for human life and, *third, that the defendant either knew that that type of conduct, that reckless indifference, was a threat to the lives of others or knew of circumstances that would reasonably cause the defendant to foresee that that type of conduct that he did might be a threat to the life of the child.*

R8–184 (emphasis added).

After commencing deliberations, the jury sent a note to the court with the following question: "Can you reword the third condition for involuntary manslaughter? It seems confusing." R2–78. The court provided a revised instruction regarding the third element: "The Defendant either knew or should have foreseen that such conduct was a threat to the lives of others." *Id.*

The jury acquitted Gaskell of second-degree murder and voluntary manslaughter, but found him guilty of involuntary manslaughter. Gaskell appeals his conviction.

## II. EVIDENTIARY RULINGS

### A. *The Demonstration by Dr. Mittleman*

■ Gaskell argues that Dr. Mittleman's demonstration of shaken baby syndrome using a rubber infant mannequin was irrelevant and unfairly prejudicial. "As a general rule, the district court has wide discretion to admit evidence of experiments conducted under substantially similar conditions." *Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir.1977). The burden is on the party offering a courtroom demonstration or experiment to lay a proper foundation establishing a similarity of circumstances and conditions. *Id.* Although the conditions of the demonstration need not be identical to the event at issue, "they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *Id.* (quoting *Illinois Central Gulf R.R. Co. v. Ishee, Mississippi*, 317 So.2d 923, 926 (Miss. 1975)).[1] Further, experimental or demonstrative evidence, like any evidence offered at trial, should be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R.Evid. 403.

■ In the presence of the jury, the government proposed that Dr. Mittleman should use the doll "to demonstrate the amount of force which would be necessary to cause [Kristen's] injuries[.]" R6–24. Moreover, the demonstration was conducted during a segment of Dr. Mittleman's testimony concerning the degree of force required to produce the fatal injuries. The conditions of the demonstration, offered for this purpose, were not sufficiently similar to the alleged actions of the defendant to allow a fair comparison. As noted by defense counsel in her objection, due to differences in the weight of the doll's head as well as the flexibility and length of the doll's neck, a considerably greater degree of force was required in order to produce the head movement characteristic of shaken baby syndrome. As the party offering the evidence, the burden was on the government to show that the conditions of Dr. Mittleman's demonstration were sufficiently similar to the circumstances of Kristen's death to afford a fair comparison. Based on the differences enumerated by defense counsel, the government failed to meet this burden. Dr. Mittleman admitted that the doll's neck was stiffer than that of a seven-month-old infant and that this would affect the degree of force necessary to move the head in the required fashion. Dr. Mittleman explained that his presentation was based on a demonstration of shaken baby syndrome by a police officer whose knowledge was derived from the confession of a father in an unrelated case. Although an

---

1. *Accord Jackson v. Fletcher,* 647 F.2d 1020, 1027 (10th Cir.1981) ("[T]he party introducing the evidence [of an experiment] has a burden of demonstrating substantial similarity of conditions. They may not be identical but they ought to be sufficiently similar so as to provide a fair comparison.")

expert may rely upon hearsay as the basis for his or her opinion if the out of court statements are "of a type reasonably relied upon by experts in the particular field," the government did not establish that Dr. Mittleman's hearsay knowledge of this unrelated case provided any reliable or accurate basis upon which to draw conclusions regarding Kristen's death. *See* Fed.R.Evid. 703. Further, although Dr. Mittleman repeatedly shook the doll before the jury, he was unable to state the number of oscillations required to produce Kristen's injuries. The conditions of the demonstration were thus substantially *dissimilar;* the government failed to establish that either the degree of force or the number of oscillations bore any relationship to the defendant's actions. Although the presentation did illustrate the path of movement of an infant's head during shaken baby syndrome, this phenomenon could have been demonstrated with equal effectiveness by a direct manipulation of the doll's head, as suggested by defense counsel at sidebar.

■ Whatever slight probative value that inhered in the demonstration was overwhelmed by its unfairly prejudicial effects. The sight of a adult male repeatedly shaking a representation of an infant with the degree of force necessary to manipulate the doll's head in the required fashion was likely to form a strong impression upon the jury.[2] This prejudicial effect was magnified by the fact that the outcome of this trial hinged upon whether the jury believed that the degree of injury suffered by Kristen could support Gaskell's testimony that he inflicted the fatal injuries in a panicked attempt to revive her. By displaying a greater degree of force than the level required to produce shaken baby syndrome in a seventh-month-old infant and by arbitrarily selecting a number of oscillations, the demonstration tended to implant a vision of Gaskell's actions in the jurors' minds that was not supported by any factual basis for the demonstration. We are thus persuaded that, under Rule 403, the unfairly prejudicial nature of the demonstration outweighed any probative value.[3]

■ The government argues, and the trial judge ruled, that the court's cautionary instructions to the jury and Gaskell's ability to point out the differences between the doll and a seven-month-old infant on cross-examination negated any prejudice resulting from the display. Under the circumstances of this case, we cannot agree. The demonstration was presented to the jury as an illustration of the amount of force required to produce Kristen's injuries. The trial court's instruction to the jury to assess the demonstration "in light of the statements and testimony you have heard" failed to highlight the dissimilarities

---

2. Several circuits have recognized that demonstrative exhibits tend to leave a particularly potent image in the jurors' minds. *United States v. Wanoskia,* 800 F.2d 235, 237–38 (10th Cir.1986); *Carson v. Polley,* 689 F.2d 562, 579 (5th Cir. 1982).

3. In *Barnes,* a products liability case, the former Fifth Circuit reversed and remanded for new trial where the plaintiff's expert was allowed to testify as to an out of court experiment in which an automobile engine lifted against the accelerator linkage, causing the assembly to jam. 547 F.2d at 276–77. The vehicle driven by the plaintiff, unlike the one used in the experiment, was fitted with "roll-stop" engine mounts designed to prevent engine lift. *Id.* The court noted that, given the lack of protective engine mounts in the vehicle used in the experiment, the demonstration was not probative of any contested issue. "[T]he experiment was likely to be misunderstood by the jury and given exaggerated weight when the evidence was of no probative value." *Id.* at 277. *Accord Jackson,* 647 F.2d at 1026–28 (requiring new trial where experiment significantly departed from conditions of accident and did not allow a fair comparison, thus possibly misleading jury on the issue of defendant's negligence).

*United States v. Myers,* 972 F.2d 1566, 1579–80 (11th Cir.1992) does not govern this case. *Myers* involved the prosecution of a former police officer for violating the constitutional rights of two arrestees by using a stun gun to shock them. The prosecution was allowed to activate a fully charged stun gun in front of the jury, while certain testimony tended to establish that the stun gun used on the arrestees was only partially charged. We disposed of Myers' claim of error based upon the fact that Myers failed to object and preserve the issue for appeal. 972 F.2d at 1580. Further, the trial judge carefully flagged the possible discrepancy in the amount of the charge for the jury. *Id.* at 1579. Finally, we found any error harm¹ess because defense counsel activated the stun gun before the jury on numerous occasions. *Id.* at 1580 n. 13.

of the demonstration with the events at issue. R6–26. Further, Dr. Mittleman's admission that the doll's neck was "a bit stiffer" than Kristen's was unlikely to erase the image of Dr. Mittleman violently and repeatedly shaking the doll. R6–29. The demonstration could not illuminate either the degree of force or the number of oscillations required to injure Kristen. Neither the cautionary instruction nor Dr. Mittleman's answers on cross-examination provided any scale of comparison from which the jury might have been able to infer from the demonstration the amount of force applied to Kristen.[4] The ability to cross-examine is not a substitute for the offering party's burden of showing that a proffered demonstration or experiment offers a fair comparison to the contested events. Particularly where the demonstration unfairly tended to prejudice the jury on the one genuinely contested issue, without providing any significantly probative testimony, neither the cautionary instruction nor the ability to cross-examine was sufficient to cure the error. The verdict turned on whether the jury believed that the manner in which Gaskell handled Kristen was consistent with a frightened attempt to revive her. By unfairly prejudicing the jury upon this pivotal issue, it is likely that the error affected his substantial rights, warranting reversal. *See United States v. Sellers*, 906 F.2d 597, 601 (11th Cir.1990).

### B. *The Exclusion of Certa's Testimony*

■ Gaskell proffered the testimony of Linda Certa, a pediatric nurse who is the head of a nationwide program designed to educate parents and physicians on shaken baby syndrome. Certa's testimony was to be offered to show the general lack of public awareness of the dangers of shaking an infant and that shaking a child for resuscitative and other purposes was once accepted medical practice. Certa purport-

edly was familiar with cases in which children had been fatally shaken for resuscitative purposes. This testimony would have tended to show that Gaskell did not know that, by shaking Kristen, he was likely to injure her seriously. Further, Gaskell wanted to show the jury a videotape prepared and used by Certa to educate parents on shaken baby syndrome.

The district court did not allow Certa to testify, concluding that her testimony would be cumulative, irrelevant in that it did not relate to Gaskell's state of mind, and would require discussion of instances of shaken baby syndrome not before the court. *The determinative issue in this case was whether Gaskell intended to revive Kristen or to injure her.* The evidence offered by the government that tended to show an intent to injure was received in the form of medical opinions regarding the amount of physical force required to produce Kristen's injuries. On direct examination, Dr. Mittleman testified for the government as follows:

> Assistant United States Attorney: Doctor, when you say "a very forceful manner," is that the manner in which you would try to revive an unconscious person?
>
> Dr. Mittleman: Well, I wouldn't. I think this is above and beyond what we consider child care. We are all taught to support the baby's head. It's fragile. You don't want to shake a baby's heads [sic].

R6–23.

In *United States v. Lankford*, 955 F.2d 1545 (11th Cir.1992), we held that the district court abused its discretion by excluding expert testimony offered by a defendant in a prosecution for tax evasion to show that he might reasonably have believed that a $1500 check was a nontaxable gift. This testimony tended to support the reasonableness of Lankford's professed be-

---

**4.** By contrast, in *Wanoskia*, the Tenth Circuit upheld the admission of an experiment in which a United States attorney was used to demonstrate that the victim could not have inflicted her own wounds because she could not have held the gun at the distance required to be consistent with the physical evidence. 800 F.2d

at 238. The government satisfied its obligation to show that the experiment was sufficiently similar to the incident at issue by offering expert testimony regarding the estimated length of the victim's arm and comparing it to the length of the demonstrator's arm. *Id.*

lief that he was unaware of his obligation to report the check as income. 955 F.2d at 1550–51. Moreover, the government was allowed to elicit an opinion as to the reasonable and proper course of conduct with regard to the check. *Id.* at 1551–52.[5]

Under the circumstances of this case, we find that the grounds enunciated by the trial court were not sufficient to justify excluding Certa's testimony.[6] Gaskell testified, in essence, that he lifted Kristen quickly and shook her in an attempt to revive her. Although Certa could not directly testify as to Gaskell's state of mind, the general lack of awareness of shaken baby syndrome is probative of Gaskell's knowledge of the dangers of handling Kristen in this fashion. "In a case ... where the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent." *United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1979) (en banc). Moreover, in the revised jury charge on involuntary manslaughter, the judge instructed the jury to consider whether Gaskell "should have foreseen" that his conduct was a threat to Kristen's life. While we find this instruction to be erroneous, Certa's testimony would have illuminated the issue of what Gaskell should have foreseen. The initial jury instruction, which correctly stated the elements of proof for involuntary manslaughter, required the jury to consider whether Gaskell "knew of circumstances that would reasonably cause the defendant to foresee that that type of conduct that he did might be a threat to the life of the child." R8–184. Certa's testimony tended to establish the circumstances known by Gaskell re-

garding the dangers of shaking an infant. Any doubt as to the relevance of this evidence should have been resolved in favor of Gaskell in light of the fact that the government's expert was allowed to opine upon the knowledge generally possessed by parents with regard to shaking an infant. "It is an abuse of discretion 'to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.' " *Lankford*, 955 F.2d at 1552 (quoting *United States v. Sellers*, 566 F.2d 884, 886 (4th Cir.1977)).

 Certa's testimony would not have duplicated the testimony of the other experts who testified for the defense. Further, given that the only contested issue in the case was Gaskell's intent in handling Kristen, any duplicative aspects of Certa's testimony would not have involved the *"needless* presentation of cumulative evidence." Fed.R.Evid. 403 (emphasis added). Although Certa's testimony might have involved unrelated cases of shaken baby syndrome, any danger of misleading the jury or prejudicing the government's case could have been resolved on a case-by-case basis by objections to any references made to such cases as Certa testified. Moreover, we note that the Dr. Mittleman's knowledge of shaken baby syndrome was based in part, as he testified, upon an unrelated case in which a parent had confessed to fatally shaking his child. Under the circumstances of the trial, the district court abused its discretion in excluding this evidence.[7] Because the excluded testimony related to the determinative issue of intent, we cannot say that the error was harmless.[8] Moreover, the error in excluding

---

5. *See also United States v. Garber*, 607 F.2d 92, 95–97 (5th Cir.1979) (en banc) (error to exclude defense expert's testimony on reasonableness of belief that payment was not taxable income where government witness allowed to testify that defendant was obligated to pay tax).

6. In part because of a lack of development of the record as to the contents of the videotape, we do not express an opinion on the question of whether the tape should have been admitted.

7. Because our holding is premised in part upon Dr. Mittleman's testimony and demonstration,

we express no opinion as to whether, on retrial, the district court would be required to admit testimony such as that offered by Certa.

8. In *Lankford*, we reversed based upon the district court's exclusion of the testimony offered by a defense expert regarding the reasonableness of Lankford's belief that he was not obligated to report a check as income. "Given the critical importance of the reasonableness issue in the determination of willfulness, we find that the trial court's error could have had a substantial impact on the outcome of the trial." 955 F.2d at 1553. In this case, we are similarly

**1064**

Certa's testimony was compounded by the admission of Dr. Mittleman's demonstration, which tended to leave an unfounded impression of the manner in which Gaskell had handled Kristen. At very least, the cumulative effect of these errors was likely to affect Gaskell's substantial rights, requiring reversal. *Sellers,* 906 F.2d at 601.

### III. JURY INSTRUCTION

■ Gaskell argues that, in reinstructing the jury on the third element of proof for the lesser, included offense of involuntary manslaughter, the district court reduced the required mental state from recklessness or gross negligence to simple negligence. The initial instruction required the jury to find that "the defendant either knew that that type of conduct, that reckless indifference, was a threat to the lives of others or knew of circumstances that would reasonably cause the defendant to foresee that that type of conduct that he did might be a threat to the life of the child." R8–184.[9] In contrast, the revised instruction allowed the jury to find involuntary manslaughter where a defendant

compelled to reverse Gaskell's conviction since the reasonableness of Gaskell's alleged ignorance of the dangers of shaking an infant was a critical component of the jury's determination regarding the required mental state for involuntary manslaughter.

9. This initial instruction essentially tracks the language of the government's proposed instruction for involuntary manslaughter.

10. Both versions of the manslaughter instruction went out to the jury in written form.

11. *See United States v. Sasnett,* 925 F.2d 392, 396 (11th Cir.1991) (per curiam) ("that the defendant knew that his conduct was a threat to the lives of others or had knowledge of the circumstances as 'could have enabled him to reasonably foresee the peril to which his act might subject others"). *Accord United States v. Browner,* 889 F.2d 549, 553 (5th Cir.1989) ("that the defendant ... have knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another"); *United States v. McMillan,* 820 F.2d 251, 255 (8th Cir.) (the defendant "acted grossly negligent in that he acted with a wanton or reckless disregard for human life, knowing that his conduct was a threat to the lives or others or

"knew or should have foreseen that such conduct was a threat to the lives of others." R2–78.[10]

■ The initial instruction essentially reflects instructions approved by this circuit and others.[11] However formulated, the intent element of the offense of involuntary manslaughter under 18 U.S.C. § 1112 is not satisfied by a showing of simple negligence. *See Sasnett,* 925 F.2d at 396.[12] In the context of this case, the practical import of the revised instruction was to allow the jury to find involuntary manslaughter if it believed that Gaskell did not know of the risks involved in shaking an infant's head, but "should have foreseen" these risks. R2–78.

Gaskell failed to object to the district court's reformulated involuntary manslaughter charge. We therefore review the revised instruction only for plain error. *United States v. Berki,* 936 F.2d 529, 532 (11th Cir.1991) (per curiam), *cert. denied,* — U.S. —, 112 S.Ct. 1677, 118 L.Ed.2d 395 (1992). An erroneous jury charge will not warrant reversal as "plain

having knowledge of such circumstances as could reasonably have enabled him to foresee the peril to which his act might subject others"), *cert. denied,* 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 193 (1987).

12. In *United States v. Fesler,* 781 F.2d 384, 393 (5th Cir.), *cert. denied,* 476 U.S. 1118, 106 S.Ct. 1977, 90 L.Ed.2d 661 (1986), the trial court instructed the jury that it could find the defendant guilty of involuntary manslaughter "if you find beyond a reasonable doubt that he or she committed a lawful act without due caution or circumspection which produced the death [of the victim]." The Fifth Circuit noted that a proper instruction on involuntary manslaughter requires the jury to find, *inter alia,* that the defendant "have knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her acts might subject another." 781 F.2d at 393. The failure to instruct the jury upon the phrase "due caution and circumspection," which appears in 18 U.S.C. § .1112, allowed the defendants to be convicted upon a lesser showing of *mens rea* than permitted under involuntary manslaughter. *Id.* By failing to require the jury to find that the defendants had acted recklessly, the trial court committed reversible error. *Id.*

error unless 'the charge, considered as a whole, is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice,' or the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Pepe*, 747 F.2d 632, 675 (11th Cir.1984) (quoting *United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. Unit B 1982)).

The jury requested clarification of the intent required for involuntary manslaughter following a day of deliberation. The day after receiving the revised instruction in written form, the jury returned a verdict of not guilty on every charge except involuntary manslaughter. Our review of the record, particularly Gaskell's testimony and the arguments of counsel, reveals that the only genuinely contested issue was Gaskell's mental state in handling Kristen on the day of her fatal injury. By allowing the jury to find involuntary manslaughter if Gaskell merely *should have foreseen* that his actions would threaten Kristen's life, it is likely that the revised instruction was critical in Gaskell's conviction. Moreover, we note that the revised instruction related to the issue of intent, the very issue implicated by the erroneous admission of Dr. Mittleman's demonstration and the improper exclusion of Certa's testimony. Under these circumstances, which establish a likelihood of a grave miscarriage of justice, we must reverse Gaskell's conviction under the plain error rule. *Pepe*, 747 F.2d at 6755.[13]

## IV. CONCLUSION

This case turned upon the jury's determination of Gaskell's knowledge and intent at the time that he handled Kristen. The demonstration of shaken baby syndrome by the government's witness suggested, without an adequate factual basis, that Kristen was handled with a degree of force inconsistent with a benign or benevolent intent. Despite the testimony of the government's expert that Kristen was handled in a manner inconsistent with child care and that all parents are taught to support a baby's head, Gaskell was not allowed to present his own expert to testify to the general lack of knowledge regarding the dangers of shaking an infant for resuscitative or other purposes, particularly in a crisis environment. Finally, the jury was erroneously instructed regarding the degree of knowledge and intent required to find involuntary manslaughter. The cumulative effect of these errors requires the reversal of Gaskell's conviction.

REVERSED.

---

**13.** The former Fifth Circuit declined to rule that failure to instruct the jury on an essential element of a crime constitutes *per se* plain error. *United States v. Brown*, 616 F.2d 844, 846 (5th Cir.1980). In *Brown*, the court noted that cases decided by the other circuits reveal "nearly a per se plain error standard in situations in which the failure of the court to instruct concerns an element of the crime relating to knowl-

edge or intent." 616 F.2d at 847 n. 7. Because the matter of intent was the critical issue at Gaskell's trial and because the jury did not return a verdict for involuntary manslaughter until after receiving the revised instruction, this case evidences a likelihood of a grave miscarriage of justice, requiring reversal under the general formulation of the plain error rule. *Pepe*, 747 F.2d at 6755. This case therefore

---

presents no occasion to consider the *per se* rule eschewed in *Brown.*