**C.A. ASSOCIATES, d/b/a Executive Tower Inn, a Colorado Limited Partnership, Plaintiff, Appellant,**

v.

**DOW CHEMICAL COMPANY, a Delaware Corporation, Defendant, Appellee.**

**No. 89–1216.**

United States Court of Appeals, Tenth Circuit.

Nov. 16, 1990.

Michael V. Ciresi (William E. Dorigan, E. Anne McKinsey, Kristin N. Lockhart, Julie D. Hagen of Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., on the brief), for plaintiff-appellant.

David M. Bernick on the brief, Kenneth W. Brothers of Kirkland & Ellis, Denver, Colo., for defendant-appellee.

Before MOORE and McWILLIAMS, Circuit Judges, and BRATTON, Senior District Judge.[*]

BRATTON, Senior District Judge.

The plaintiff-appellant, C.A. Associates ("Associates"), is the owner of the Executive Tower, a 30–story building constructed in downtown Denver and completed in January, 1974. Associates claims that Sarabond, a product developed and marketed by Dow Chemical Company ("Dow") as a masonry mortar additive, has caused the masonry on its building to begin cracking and falling off. It further claims that Dow knew or should have known of Sarabond's

---

[*] The Honorable Howard C. Bratton, Senior United States District Judge for the District of New Mexico, sitting by designation.

defective properties at the time the Executive Tower was built but that Dow fraudulently concealed this knowledge. At the conclusion of a seven-week trial in the district court, the jury returned a special verdict in favor of Dow finding that mortar mixed with Sarabond caused no more masonry cracking than conventional mortar, that Sarabond was not defective, and that Dow had made no misrepresentations to Associates concerning Sarabond. Associates now challenges the final judgment entered below, averring, *inter alia*,[1] that the trial court abused its discretion at trial in excluding evidence of Sarabond-related failures in other structures.

## I.

Before withdrawing Sarabond from the market, Dow manufactured and marketed this saran latex product as an additive for mortar to increase the mortar's bonding or adhesive strength. Beginning in the mid 1960s Dow worked closely with Denver masonry contractor Gage Behunin, who, under Dow's tutelage, became one of the pioneers in the use of Sarabond in prefabricated brick panels. Behunin ultimately became the masonry contractor for the Executive Tower and utilized these prefabricated brick panels on Associates' building. Associates asserts that the brick and mortar panels are now beginning to crack and fall off due to the defective properties of Sarabond.

The crux of Associates' theory is that Sarabond, when mixed with portland cement mortar, induces the corrosion of steel embedded in the mortar. According to Associates, this corrosion occurs despite the climate or the configuration of the structure upon which Sarabond is used.[2]

Associates' expert chemist, William Hime, testified at trial that steel embedded in ordinary portland cement mortar is generally resistant to corrosion. Normally, the high alkalinity of cement causes the steel to form a thin oxidized layer that resists significant corrosion. Sarabond, by contrast, releases inorganic chloride ions when mixed with portland cement mortar. These chloride ions act as a catalyst, eating away the resistant layer of the steel. The result of this corrosive process is the buildup of a rust product which occupies between two and ten times more space than the original metal. The corrosion of the steel embedded in walls will continue until it exerts sufficient pressure to cause the brick and mortar to crack, separate from the building frame, and ultimately fall off the building.

Associates further claims that Dow became aware of this problem years before construction of Associates' building but, nonetheless, actively promoted Sarabond's utility to architects, engineers, and masonry contractors. In particular, Dow encouraged Gage Behunin to use Sarabond. Associates seeks recovery alleging that Dow made misrepresentations and concealed certain facts concerning Sarabond, and that Gage Behunin on behalf of Associates relied thereon, resulting in the ultimate injury to Associates.

Associates' action was tried below under the theories of strict liability, negligence, fraud, breach of warranty, and violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 *et seq.* (1963). It was originally consolidated for trial with the claims of four other entities, each owning separate buildings constructed with Sarabond and located in the Denver, Colorado area. At a pre-trial conference held approximately one month prior to trial, the

---

1. In addition, Associates asserts that the trial court erred: 1) by excluding evidence of fraudulent conduct by Dow employees arising after the completion of Associate's building, 2) in certain instructions to the jury, and 3) in its direction of a verdict in favor of Dow on Associates' breach of warranty claim.

2. Associates asserted below that Sarabond would induce corrosion in every circumstance in which Dow's saran latex products are mixed in portland cement mortar containing embedded steel. According to Associates, it does not matter whether Sarabond is used in prefabricated masonry or "laid in place" masonry, single story or multi-story buildings, tunnels or bridges, cold climate, warm climate, wet climate, or dry climate; in any circumstance involving metal embedded in a Sarabond-mortar mix, corrosion will occur.

district court decided to proceed to trial on only two of the five actions originally consolidated for trial. Thus, only two buildings were ultimately the subject of the trial below. One of these actions has since been settled.

## II.

Associates' first assertion of error arises out of a ruling on an evidentiary issue regarding the admissibility of evidence relating to buildings other than the buildings which were the original subjects of trial. This issue was thoroughly explored by the district judge in a series of pre-trial conferences.

At the first pre-trial conference, held some six months prior to the date set for trial, the court requested that the parties submit a list of buildings on which they intended to offer evidence, excluding the five buildings which were at that time the subjects of the consolidated trial. The court also requested supporting briefs.

Thereafter, the plaintiffs submitted a list of sixteen additional buildings. They informed the court that the evidence concerning other Sarabond structures was necessary because, with the relatively young age of the Denver-area buildings and Denver's dry climate, the five buildings at issue were at the "beginning stages of the corrosion cycle." The plaintiffs claimed that their experts needed evidence of other buildings to demonstrate the long-term corrosive effect of Sarabond and to rebut certain anticipated defenses of Dow.[3]

Dow opposed the reference by the plaintiffs at trial to any other structures beyond those five which were to be the subjects of the consolidated trial. Dow argued that discussion of other structures in the course of trial would involve a series of "mini-trials" concerning each separate structure referenced, causing confusion to the jury,

delay and prejudice. Dow also claimed it had not conducted complete discovery on the buildings the plaintiffs wished to introduce.

The court refused to allow introduction of evidence concerning all of the sixteen other buildings proposed by the plaintiffs on Fed.R.Evid. 403 grounds. The court expressed concern that an unfair inference favoring the plaintiffs would arise simply by virtue of the number of buildings referred to if the plaintiffs were allowed to name and discuss the five Denver buildings and sixteen other Sarabond buildings indicating distress.[4] The court also sought to avoid jury confusion and undue delay of the trial.

At a second pre-trial conference held three months before trial, the court adopted the compromise proposal of Dow. Dow proposed that if the court allowed other building evidence beyond the five Denver buildings, the court limit this additional evidence to the nine "Sarabond buildings" located on the Dow campus in Midland, Michigan. The plaintiffs had included in their original list of sixteen additional buildings two of the buildings at Dow's Midland headquarters, but not the other seven.

Dow claimed that the proposal would allow its experts immediate access to the other structures, as opposed to the situation if the court allowed in evidence of some other structures upon which Dow's experts had had limited or no discovery. Further, it would accommodate the plaintiffs' corrosion theory in that some of the Dow buildings were older than the Denver buildings and were situated in a wetter climate than Denver.

The crux of Associates' complaint is not that it was denied the opportunity to introduce a sufficient quantity of other building evidence; indeed, the court allowed the

---

**3.** The plaintiffs pointed to the pre-trial order in which Dow stated *inter alia* that the buildings at issue suffered structural distress as a result of design and construction flaws, and that Sarabond was no more corrosive than ordinary mortar if metals are properly embedded.

**4.** The plaintiffs' counsel described to the court how plaintiffs' experts would utilize each building in testimony. The court responded, "The difficulty with that, of course, is that it generates this momentum that would be unfair, that with so many buildings having this, it must be at fault, and that I'm not going to permit."

plaintiffs' experts to discuss at trial some fifteen separate structures in addition to the Executive Tower.[5]  Instead, Associates claims it was arbitrarily limited in its choice of the identity of the other building evidence to be offered.  Associates complains that the trial judge's ruling severely limited its ability to effectively support and authenticate the testimony of its experts and to rebut the defense testimony of Dow's experts.

■  It is apparent from our review of the record that the trial judge invested a great deal of time prior to trial acquainting himself with the theories of all parties and giving due consideration to evidentiary issues.  Thus, it is entirely appropriate that we accord deference to the trial judge who is most familiar with the circumstances surrounding the issues in question.  *Higgins v. Martin Marietta Corp.*, 752 F.2d 492, 498 (10th Cir.1985).  Such deference is particularly fitting in lengthy trials involving this magnitude of highly technical expert testimony.  Therefore, we will not disturb the trial court's conduct of trial proceedings unless it affirmatively appears from the record that the trial court abused its discretion.  *Id.*

■  In the context of rulings under Fed. R.Evid. 403, the task of the trial judge is one of "balancing the probative value of and need for the evidence against the harm likely to result from its admission."  *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1257 (10th Cir.1988).  This is a task to which the trial judge is particularly suited because of his familiarity with the full array of the evidence.  *Id.*  Thus, we will not reverse absent a clear abuse of discretion.  *See also Marsee v. United States Tobacco Co.*, 866 F.2d 319, 321 (10th Cir.1989);

*Agristor Leasing v. Meuli*, 865 F.2d 1150, 1152 (10th Cir.1988);  *Wheeler v. John Deere Co.*, 862 F.2d 1404, 1410 (10th Cir. 1988) ("if judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal") *citing United States v. Glover*, 846 F.2d 339, 343 (6th Cir.1988).

■  The threshold inquiry in any argument asserting erroneous exclusion of evidence is, of course, whether the evidence is relevant.  Both federal and state courts routinely permit introduction of substantially similar acts or occurrences in product liability actions to demonstrate the existence of a defect, to prove notice, or to refute testimony given by defense witnesses.  *Ponder v. Warren Tool Corp.*, 834 F.2d 1553, 1560 (10th Cir.1987); *Rexrode v. American Laundry Press Co.*, 674 F.2d 826, 829 n. 9 (10th Cir.), *cert. den.*, 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982); *Jacobs v. Commonwealth Highland Theaters, Inc.*, 738 P.2d 6 (Colo.App.1986).  In a product liability action, the occurrence of similar accidents or failures involving the same product holds great relevance, since evidence of such failures tends to make the existence of a defect more probable than it would be without the evidence.  *See* Fed.R. Evid. 401; *Rhodes v. Michelin Tire Corp.*, 542 F.Supp. 60, 62 (E.D.Ky.1982).

■  However, the relevance of the evidence concerning the additional buildings which the plaintiff proffered is not seriously contested.  Of crucial concern to the judge was the relevance of that evidence in juxtaposition to its tendency to confuse the jury, unduly prolong the trial, and unfairly prejudice the defendant with inflammatory and cumulative evidence.[6]

The standard for exclusion under Fed.R. Evid. 403 is somewhat exacting.  "Rele-

---

**5.**  Associates was allowed to discuss all five of the Denver-area buildings despite the fact the trial court had ordered that only two of these cases would be tried.  The court also allowed evidence to be admitted regarding the nine buildings constructed with Sarabond at Dow's headquarters in Midland, Michigan, and two other structures: the Plymouth Swimming Pool (constructed in 1963) and the Fort Collins Picnic Shelters (constructed in 1966).

**6.**  As evidence of this concern, the trial judge excluded any evidence concerning the Eisen-

hower Tunnel.  The court refused admission of this evidence without equivocation stating, "[B]ecause of Colorado and what the Eisenhower Tunnel means to the people in this state, we would have a very prejudicial effect, and I don't want to voir dire a jury about how many times they drive through the Eisenhower Tunnel and did they ever worry about it falling in on them. So we're going to keep the Eisenhower Tunnel out, Rule 403 if nothing else."  At one point the court further admonished plaintiffs, "What you want is every bit of perjorative (sic) evidence

vant evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice." Fed.R. Evid. 403 (emphasis added). *See also Wheeler v. John Deere Co.*, 862 F.2d 1404, 1410 (10th Cir.1988) ("We have stated on numerous occasions that 'the exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly' ") *citing Romine v. Parman*, 831 F.2d 944, 945 (10th Cir.1987) *citing K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155 (10th Cir.1985).

Notwithstanding that standard, we are unable to state that the ruling of the trial judge constitutes an abuse of discretion. At the outset, the record shows that Associates was permitted in its case-in-chief and rebuttal to introduce a substantial amount of evidence regarding other structures in support of its various theories.[7] The judge allowed Associates to introduce evidence of at least six buildings older than the Executive Tower and nine buildings situated in a climate significantly wetter than that in Denver. Two of the buildings used to illustrate the age and climate theories were on the plaintiffs' original list of sixteen buildings. Moreover, our review of the record indicates that the plaintiffs' experts were able to offer extensive "other building" evidence to rebut the defenses raised by Dow without going outside the parameters of the trial court's ruling. This lessened the relevance of and need for the extensive evidence of other structures.

The court sought with its order to avoid significant delay, confusion and prejudice. At one point, the parties had contemplated

introducing evidence concerning, potentially, well over the 21 separate structures indicated by the plaintiffs.[8] Given the complexity of the subject matter, we agree that the potential for delay and confusion could multiply with each additional building offered into evidence.

Moreover, Dow's defense rested upon an analysis of the structural forces that can cause cracking unrelated to Sarabond. Thus, each building added to the list would bring with it a whole history of design, construction, and performance and a whole metallurgical, chemical, and structural analysis. The court's ruling set an appropriate limit on the scope of evidence which either party could discuss at trial. In confining the number of buildings admissible at trial, the lower court prevented the jury from inferring that Sarabond was defective simply because many buildings had been investigated.

Similarly, we disagree with Associates' contention that the trial court unduly restricted the scope of the plaintiffs' experts' testimony and improperly limited the plaintiffs' rebuttal evidence. As discussed above, the trial court's considered limitation on reference to evidence taken from other structures was in accordance with his discretion under Fed.R.Evid. 403. *See also Quinones v. Pennsylvania Gen. Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir.1986) (trial judge has broad discretion in ruling on admissibility of expert testimony); Fed.R. Evid. 702. *Cf. Marsee v. United States Tobacco Co.*, 866 F.2d 319, 323–24 (10th Cir.1989) (admission of rebuttal testimony subject to discretion of the trial judge);

you could find to inflame the jury, that's what you want. I don't blame you, but that isn't what you're going to get."

7. As indicated above, under plaintiffs' age and climate theories, the plaintiffs suggested that evidence of other buildings was necessary to illustrate the future effect of corrosion on the Denver-area buildings because, with the relatively young age of these buildings and the dry Denver climate, the corrosion of these buildings was in the initial stages. However, the court also clearly held plaintiffs to their broader theory regarding Sarabond that in any configuration of building or climate corrosion would occur.

8. The plaintiffs were not alone in their request to introduce other building evidence. Counsel

for Dow informed the court that if the plaintiffs were allowed to discuss what they believed to be "bad" Sarabond buildings, Dow would "fight fire with fire" and seek introduction of evidence from its "data bases of 40 or 50 buildings." The court's ruling limited the defendant's access to "other building" evidence as well as the plaintiffs'. Otherwise, the court would have faced the possible introduction of evidence from the five Denver buildings, the sixteen buildings proposed by the plaintiffs, and any other buildings introduced by Dow. Further, the plaintiffs' offer of proof concerning proffered rebuttal testimony included eight additional buildings not before proffered.

*Brownlee v. Gay and Taylor, Inc.,* 861 F.2d 1222, 1225 (10th Cir.1988) (trial judge has broad discretion in determining competency of expert witness).

Accordingly, we find that the trial court acted within its discretion in limiting the evidence as it did in this case. Upon the basis of the admitted evidence, the jury found specially that Sarabond did not cause more cracking during the lifetime of a building than did conventional mortar. This finding, Associates conceded below, was dispositive as to all Associates' affirmative claims. Associates cites additional error;[9] however, we note the concession of Associates, and, having reviewed all of the remaining claims, find no issue of merit necessitating further discussion.

AFFIRMED.

9. One error raised involves the court's instruction number 77 which, in substance, instructed that the jury should not consider evidence of scientific advancements discovered subsequent to the time Sarabond was sold by Dow to Associates. Neither party disputes that under Col. Rev.Stat. § 13–21–404, which served as the basis for the instruction, the jury may not consider subsequent scientific advancements, but may inquire into alternative concepts implemented later and known to be possible at the time of manufacture. Associates argues that since the court admitted into evidence tests and reports post-dating the sale of Sarabond to Associates, the court must have determined that these subsequent tests reflected "alternative concepts"; therefore, these tests and reports should have been expressly exempted from the challenged instruction or the instruction should have been omitted. We reject that contention. Under our reading of the instructions as a whole, see *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1549 (10th Cir.1987), it is apparent that the court did direct the jury to consider the subsequent tests and reports for their scientific value in aiding jury understanding, but not for holding Dow responsible for post-construction industry advancements. *See* Instruction No. 78. Further, the admitted tests and reports do not fall within the purview of the instruction. These tests involved saran latex, rather than some "alternative concept." Associates made no attempt to present any evidence regarding "alternative concepts" which were "known to be possible at the time of manufacture." Thus, the post-construction tests and reports were not even addressed by the challenged instruction.