979 F.2d 1434
 37 Fed. R. Evid. Serv. 225, Prod.Liab.Rep. (CCH) P 13,373
FOUR CORNERS HELICOPTERS, INC., a Colorado corporation;
Jenny R. Paton, as surviving spouse and as
personal representative of the Estate of
William Paton, deceased,
Plaintiffs-Appellees,
v.
TURBOMECA, S.A., a French corporation, Defendant-Appellant,
and
Societe Nationale Industrielle Aerospatiale, a French
corporation; Aerospatiale Helicopter Corporation, a
Delaware corporation; Avialle, Inc., a Delaware
corporation; Roberts Aircraft, Inc., an Arizona
corporation, Defendants.
 No. 91-1295.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 17, 1992.
 
 Mary A. Wells (J. Mark Smith and Stephen J. Baity, with her on the briefs), of Weller, Friedrich, Ward & Andrew, Denver, Colo., for appellant.
 James A. Cederberg (Douglas E. Bragg, with him on the brief), of Bragg, Baker & Cederberg, P.C., and Chris A. Mattison (Alan Epstein, with him on the brief), of Hall & Evans, Denver, Colo. for plaintiffs-appellees.
 Before LOGAN, HOLLOWAY and BARRETT, Circuit Judges.
 BARRETT, Senior Circuit Judge.
 
 
 1
 Turbomeca, S.A. (Turbomeca) appeals from a judgment entered in favor of plaintiffs Jenny Paton and Four Corners Helicopters, Inc. (Four Corners).
 
 Factual Background
 
 2
 This case arises from a helicopter crash which resulted in the death of pilot William Paton (Paton), husband of Jenny Paton. At the time of the accident, Paton was operating an Aerospatiale SA 315 B "Lama" helicopter for his employer, Four Corners. The helicopter was powered by an Artouste IIIB turbine engine, designed and manufactured by defendant Turbomeca.
 
 
 3
 The Artouste IIIB is a constant-speed engine which maintains the same revolutions per minute (RPMs) during operational maneuvers by sensing deviations in RPMs and adjusting the amount of fuel delivered to the engine. This process produces additional heat, and if the engine temperature limits are exceeded, the engine will burn itself up.
 
 
 4
 At the time of the accident, Paton was using the helicopter to transport a compressor by long-line. Although this maneuver placed substantial demands on the engine, it was within the engine's limits. Prior to the accident, this helicopter had been used extensively for this type of mission and, in fact, following the accident, was replaced by a similar aircraft. In the instant case, it is undisputed that the helicopter engine overheated, causing the aircraft to crash. The issue at trial was the cause of overheating.
 
 
 5
 The National Transportation Safety Board (NTSB) investigated the accident at the scene, during engine dismantling, and at Turbomeca's facility in France. The NTSB discovered that a loose labyrinth screw had backed out of position and contacted the compressor impeller. In its report, the NTSB noted that an abnormal squeal, caused by the screw rubbing the diffuser-holder plate, had been witnessed prior to the crash of the aircraft. The NTSB's report also documented twenty-one previously reported instances where, during the course of engine repair or maintenance, it was discovered that the labyrinth screw had rubbed the impeller. In each instance, the engine was removed either because of abnormal noise which occurred during engine rundown, later discovered to be the screeching of the screw on the impeller, or because of a slightly slower rundown time.
 
 
 6
 Turbomeca also participated in the investigation, conducting loose screw tests upon a similar engine and then transmitting the results to the NTSB and the Federal Aviation Administration (FAA). In its report, Turbomeca reviewed the same twenty-one prior loose screw incidents but concluded that the friction between the screw and the impeller was a minor anomaly which had no effect on the correct operation of the engine. Turbomeca had previously issued Service Bulletin TU133, labelled "URGENT," which outlined a modification procedure to "improve locking of front labyrinth fastening screws on diffuser cover." The company recommended that the modification be performed as soon as possible on both the production line and when repairing engines. The modification consisted of "staking" the screw heads to the surrounding metal, and was performed on the subject engine in 1979 at Turbomeca's factory in France. During Turbomeca's final testing of the engine in question, the engine "seized" during rundown. This seizure was the subject of a second report by Turbomeca which was never provided to the NTSB, the FAA, or Four Corners.
 
 
 7
 Plaintiffs proceeded to trial on strict liability in tort and negligence theories. They asserted that the helicopter engine failed when a loose labyrinth housing screw backed out of position and contacted the rear face of the compressor impeller. They claimed that this contact reduced the engine's RPMs, causing additional amounts of fuel to be injected into the engine. The additional fuel produced an increase in temperature beyond the engine's limits, resulting in the engine's destruction.
 
 
 8
 Turbomeca asserted that the loose labyrinth screw could not have caused the engine failure. Turbomeca presented evidence that when a helicopter is required to hover and place a load in a confined area, a collective pitch change results, increasing the engine's temperature, over which the pilot has control. Turbomeca argued that in the instant case, the pilot's demands on the aircraft, namely pulling up too much on the collective pitch control, caused the engine to overheat and ultimately fail. Although Turbomeca's accident reconstructionist opined that no mechanical failure caused the accident, he nevertheless conceded that if there had been a mechanical problem, his theory on pilot error would not be appropriate.
 
 
 9
 The jury found Turbomeca liable under strict liability only. The district court entered judgment on the jury's verdict, including interest and costs, in favor of Paton in the amount of $959,926.20 and in favor of Four Corners in the amount of $306,204.37.
 
 
 10
 On appeal, Turbomeca contends that the district court erred in: (1) instructing the jury on a rebuttable presumption that the decedent acted with reasonable care at the time of the accident which caused his death; (2) admitting evidence of sixteen incidents involving labyrinth seal screw backouts; (3) excluding evidence of an experiment conducted by Turbomeca's expert; (4) permitting recovery of economic damages under a strict liability theory; and (5) awarding prejudgment interest on future damages, discounted to the date of trial rather than the date of the decedent's death.
 
 Discussion
 
 11
 I. PRESUMPTION OF REASONABLE CARE INSTRUCTION
 
 
 12
 Turbomeca contends that the district court erred in instructing the jury on a rebuttable presumption that the decedent acted with reasonable care at the time of the accident which caused his death.
 
 
 13
 In instructing the jury, the district court directed the jurors to "consider only evidence admitted in the trial," which included, among other things, "all presumptions stated in [the] instructions." The court indicated that "[p]resumptions are rules based on experience or public policy and are established om [sic] the law to assist the jury in ascertaining the truth." Then, over Turbomeca's objection, the court instructed that "[w]hen a person is dead and cannot testify concerning his actions, the law presumes, unless there is evidence to the contrary, that the decedent acted with reasonable care."
 
 A.
 
 14
 Citing Simpson v. Anderson, 33 Colo.App. 134, 517 P.2d 416, 417 (1973), rev'd on other grounds, 186 Colo. 163, 526 P.2d 298 (1974), Turbomeca asserts that under Colorado's comparative fault law, the decedent in a wrongful death action is not presumed to have acted with reasonable care. In Simpson, the Colorado Court of Appeals noted that the presumption of due care was "created primarily to ameliorate the harsh effect of a complete denial of recovery resulting from a finding of contributory negligence...." Id. Because under comparative negligence a plaintiff's fault will not entirely defeat his recovery, "the rationale behind [the] presumption is therefore no longer persuasive." Simpson, 517 P.2d at 417. The Simpson court concluded "that a rule that presumes exercise of due care by a decedent is inapplicable in wrongful death actions tried under [the] comparative negligence statute." Id.
 
 
 15
 Simpson is determinative on this issue, even though the presumption of due care was later reaffirmed by the Colorado Supreme Court in City and County of Denver v. DeLong, 190 Colo. 219, 545 P.2d 154 (Colo.1976). DeLong indicates that an instruction on the rebuttable presumption of due care is appropriate in a personal injury action where a party's injury results in amnesia. The court in DeLong intended that the reader compare the presumption discussed in DeLong with its discussion in Simpson. The DeLong court cited five cases supporting the presumption, followed by this reference: "cf., Simpson v. Anderson," (citation omitted), "which prohibits the use of the presumption in a wrongful death action when comparative negligence is the issue." DeLong, 545 P.2d at 156-57. DeLong cites Simpson as authority which supports a proposition different from that espoused in DeLong.
 
 
 16
 The instant case is brought under Colorado's comparative fault statute. As such, decedent's fault, if any, will not completely bar recovery. Therefore, the rationale behind application of the presumption does not exist. Following Simpson, we hold that the presumption is inapplicable in a wrongful death action where comparative negligence is at issue. Though the district court gave an erroneous jury instruction, this does not end our inquiry.B.
 
 
 17
 "[A]n error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." Street v. Parham, 929 F.2d 537, 539-40 (10th Cir.1991) (citations omitted). Turbomeca claims that the giving of a jury instruction on a presumption which is not available under state law is prejudicial error requiring a new trial. "When reviewing a claim of error relating to jury instructions, the instructions must be read and evaluated in their entirety." United States v. Denny, 939 F.2d 1449, 1454 (10th Cir.1991) (citing Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). The reviewing court "will consider from the jury's standpoint whether what the jury heard, even though not faultless, misled it in any way." United States v. Agnew, 931 F.2d 1397, 1410 (10th Cir.1991) (citing Durflinger v. Artiles, 727 F.2d 888, 895 (10th Cir.1984)), cert denied, --- U.S. ----, 112 S.Ct. 237, 116 L.Ed.2d 193 (1991).
 
 
 18
 Turbomeca raises three arguments asserting that this erroneous jury instruction was prejudicial. Citing Union Ins. Co. v. RCA Corp., 724 P.2d 80 (Colo.Ct.App.1986), Turbomeca initially contends that the instruction impermissibly aided the plaintiff by influencing the jury's determination of whether Turbomeca met its burden of proving comparative fault. In Union Insurance, a products liability action, the court held that while the presumption of nondefectiveness instruction did not shift or alter the plaintiff's burden of persuasion, it affected that burden by aiding the defendant in supplementing his burden of going forward. Because the defendant's evidence was confusing, precluding the court from determining whether the jury was influenced by the instruction, the instruction provided the jury with "affirmative evidence to which defendant was not entitled." Id. at 83-84.
 
 
 19
 For the same proposition, Turbomeca also relies on Telecky v. Yampa Valley Elec. Assn., 837 P.2d 253 (Colo.Ct.App.1992), cert. granted (Oct. 13, 1992), where the district court gave a jury instruction on a proper rebuttable presumption but nevertheless held that that instruction alone was "incomplete and possibly confusing to the jury, in that it [did] not instruct the jury concerning what circumstances [were] sufficient to rebut the presumption." The court indicated that reversal was required where the instruction may have impermissibly influenced the jury's determination of whether plaintiff met her burden.
 
 
 20
 The instant case is distinguishable from the cases upon which Turbomeca relies. Unlike Union Insurance, the presumption instruction in the instant case included limiting language. Clearly, with evidence to the contrary, the presumption was rebutted and Turbomeca's burden was thereby unaffected. While the instruction alone in Telecky may have been incomplete and possibly confusing, in the instant case, the substance of the instructions given was not confusing to the jury. Taken together, the instructions fairly, adequately, and correctly stated the law, providing the jury with an ample understanding of the principles of law confronting them. United States v. Denny, 939 F.2d 1449 (10th Cir.1991).
 
 
 21
 Second, Turbomeca asserts that the court did not state that the presumption of due care was rebuttable, thereby providing no guidance on the amount of proof required to overcome the presumption. This court has indicated that "[r]ebuttable presumptions in the civil law are normally overcome by a preponderance of the evidence," though there are "no universal rules" governing the amount of evidence required. Tafoya v. Sears Roebuck and Co., 884 F.2d 1330, 1337 (10th Cir.1989).
 
 
 22
 In the instant case, the court instructed the jury that the plaintiff bears the burden to prove, by a preponderance of the evidence, every element of the claim it asserts. And, the court instructed that the defendant bears the same burden to prove its affirmative defense. The court defined a preponderance as "such evidence as, when considered and compared with that opposed to it, has more convincing force and produces in [the jurors'] minds a belief that what is sought to be proved is more likely true than not true," indicating that this does not require proof to an absolute certainty. Furthermore, prior to giving the instruction on the presumption of due care, the court gave a presumption instruction on the defectiveness of the helicopter engine, where it concluded that the presumption could be "rebutted by evidence to the contrary."
 
 
 23
 The parties' burdens of proof were clearly set forth in the jury instructions. The court similarly made it clear that presumptions could be rebutted by contrary evidence. The instruction in question, on its face, stated in part that "the law presumes, unless there is evidence to the contrary, that the decedent acted with reasonable care." (Emphasis added). Furthermore, during oral argument before this court, counsel for Turbomeca acknowledged that in her closing arguments to the jury she contended that the presumption could not apply because Turbomeca had presented evidence of the decedent's fault. Counsel's argument indicated that "evidence to the contrary" had been presented, thereby rebutting the presumption and dissipating any potentially reversible error.
 
 
 24
 Finally, Turbomeca asserts that when a general verdict is returned and it cannot be determined with absolute certainty that the jury was not influenced by the erroneous instruction, reversal and remand for a new trial are required. See Farrell v. Klein Tools, Inc., 866 F.2d 1294, 1298-1301 (10th Cir.1989). In the instant case, a general verdict form was not used. Jurors answered Special Verdict Form B, indicating that both plaintiffs were entitled to recover damages on their claims of product liability but not on their claims of negligence, and that neither the decedent nor Four Corners was at fault. The completion of this Special Verdict does not frustrate a determination of the basis of the jury's decision.
 
 
 25
 Though the district court erroneously instructed the jury on a rebuttable presumption of due care which does not exist in wrongful death actions brought under the comparative negligence statute, such error did not prejudice Turbomeca. The jury instructions, taken as a whole, constituted a fair and adequate statement of the law upon which the jury could base its decision.
 
 II. EVIDENCE OF SIMILAR INCIDENTS
 
 26
 Turbomeca contends that the district court erred in admitting evidence of other incidents of labyrinth seal screw backouts.
 
 
 27
 At trial, plaintiffs introduced, from various repair facilities, sixteen reports of loose labyrinth screws and a computer printout listing those reports. These documents were offered on the issues of design defect, notice of design defect, duty to warn, negligence, causation, and to refute Turbomeca's claim that the accident was caused by a maintenance problem due to excessive vibration.
 
 
 28
 The district court concluded that plaintiffs showed substantial similarity between the other incidents and the engine failure in this case. Indicating that there are never two exactly identical cases, the district court ruled that "slightly different factors don't render any of the proffered incidents not substantially similar for the purpose for which they are offered...." The court found that the incidents were relevant for all purposes offered by plaintiffs and that any differences between the other incidents and the engine failure in this case affected the weight of the evidence and not its admissibility. Furthermore, Turbomeca was free to cross-examine on the distinctions, and it subsequently failed to request a limiting instruction.
 
 
 29
 Citing Wheeler v. John Deere Co., 862 F.2d 1404 (10th Cir.1988), Turbomeca asserts that the incidents were not other accidents caused by inflight engine failure and, accordingly, were not substantially similar to the accident in question. It contends that significant distinctions exist between the incidents and the accident in question, which reflect a lack of substantial similarity between the occurrences. Specifically, Turbomeca notes the following differences: none of the reports records an inflight failure of an Artouste IIIB engine; some of the reports concerned Artouste II rather than Artouste IIIB engines; none of the incidents reported involved accidents, but instead concerned mechanical problems identified on the ground; in some of the reports the compressor impeller was made of aluminum, a softer material than the titanium used on other impellers; with one exception, the reports concerned engines which were not under power[1] when problems occurred; and the screw in the instant case was fixed in place by a method described in Turbomeca Service Bulletin TU133, whereas in other Artouste IIIB engines, a different, less secure fixation method was utilized. Further, Turbomeca claims that none of the reports established proof that the labyrinth screw could cause a catastrophic engine failure such as occurred in the instant case.
 
 
 30
 Plaintiffs introduced testimony that: all incidents involved Artouste II or Artouste IIIB engines, the same generic engine; the screws and seals, and the retention of the screws were the same, as were the manufactured tolerances; and in virtually all incidents a squeaking or grinding noise was identified during engine coastdown, engine lockup or stiff stoppage occurred during shutdown, and a wear and rub pattern appeared on the head of the screw and the aft of the impeller. Plaintiffs' expert also indicated that Turbomeca's use of these very incidents to support its own position, in its report submitted to the NTSB and the FAA, demonstrated Turbomeca's belief that the incidents were sufficiently similar.
 
 
 31
 The district court's ruling regarding the admission of similar incidents will not be reversed absent a clear abuse of discretion. C.A. Assocs. v. Dow Chemical Co., 918 F.2d 1485, 1489 (10th Cir.1990). In product liability actions, the occurrence of similar accidents or failures involving the same product has great impact on a jury, as it tends to make the existence of the defect more probable than it would be without the evidence. Id. In such actions, courts routinely permit the introduction of substantially similar acts to demonstrate notice, the existence of a defect, or to refute testimony given by defense witnesses. Id.
 
 
 32
 "Before introducing such evidence, the party seeking its admission must show the circumstances surrounding the other accidents were substantially similar to the accident involved in the present case." Wheeler, 862 F.2d at 1407. Substantial similarity depends upon the underlying theory of the case. "Evidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury." Id. The requirement of substantial similarity is relaxed, however, when the evidence of other incidents is used to demonstrate notice or awareness of a potential defect. Id. "Any differences in the accidents not affecting a finding of substantial similarity go to the weight of the evidence." Id. See also Jackson v. Firestone Tire & Rubber Co., 788 F.2d 1070, 1083 (5th Cir.1986).
 
 
 33
 In the instant case, plaintiffs offered evidence of these similar incidents to prove, among other things, a design defect and notice thereof, and to refute Turbomeca's assertion that there was no mechanical failure. The incidents, though not identical, were substantially similar and were therefore admissible to indicate the existence of a defect. They further met any relaxed requirement of similarity and were therefore admissible for all purposes offered by plaintiffs. We hold that the district court did not abuse its discretion in admitting these prior incidents which showed substantial similarity with the engine failure in the instant case.
 
 III. VIDEOTAPED EVIDENCE OF EXPERIMENT
 
 34
 Turbomeca contends that the district court erred in excluding evidence of an experiment conducted by Turbomeca's expert, Dr. Manning.
 
 
 35
 Turbomeca undertook two experiments in support of its argument that the loose labyrinth screw could not have caused the seizure of the helicopter engine. The first experiment, an attempted recreation of the accident under controlled conditions at Turbomeca's plant, is not at issue. Rather, at issue is the second experiment which was conducted by Manning. For his experiment, Manning attached a titanium disc to a lathe which, according to Turbomeca, rotated the disc "in a manner representative of the turning compressor impeller." Manning observed the results when a screw, identical to the labyrinth screw in issue, was mounted in a holder and was placed in contact with the rotating disc. According to Manning's report, the screw head was worn similar to the one in question, but the lathe was not affected and continued to operate without a reduction in RPMs. Manning concluded that since the three horsepower lathe was unaffected by the contact, an eight-hundred horsepower engine would likewise be unaffected.
 
 
 36
 According to Turbomeca, the purpose of the experiment was three-fold: (1) to determine the coefficient of friction and demonstrate why the screw contacting the titanium impeller could not have caused the engine to overheat; (2) to show what happens to a screw which comes into contact with a rotating titanium impeller, in terms of thermal damage and physical deformation (Turbomeca noted that this gave Manning a basis upon which to form his expert opinion); and (3) to show the reduction in RPMs which might be expected to occur (Turbomeca asserted that the force required to cause the engine to overheat as plaintiffs suggested would have caused considerably different and more extensive damage to the screw than actually occurred). Overall, Turbomeca argues that the experiment was offered to illustrate general physical and scientific principles.
 
 
 37
 Plaintiffs filed a Motion in Limine to exclude evidence of the experiment which they challenged as being substantially dissimilar to the accident. In support thereof, plaintiffs attached the affidavit of their expert, Robert Phillips, who described the dissimilarities between Manning's experiment and the conditions operating in the Artouste IIIB engine at the time of the accident. The distinctions included the following: the lathe is a high-torque device while the helicopter engine is low-torque; the lathe operated at approximately 1000 RPMs while the engine functioned at 35,500 RPMs; and in the lathe experiment, 100% of the torque was applied to the screw, while in the engine only a small percentage of torque handled the resistance of the screw; plaintiffs assert that the jamming of the screw and subsequent impact on RPMs occurred in less than two seconds while the lathe tests lasted between 45 and 54 seconds; and in the lathe experiment, there was no support for the screw head and thus no wedging or jamming occurred, whereas wedging occurred in the engine. Phillips concluded that Manning's experiment did not accurately depict events occurring inside of the engine at the time of the accident.
 
 
 38
 The district court excluded the videotape of Manning's experiment, finding such evidence irrelevant due to lack of substantial similarity. Further, the court excluded the information because, under Rule 403 of the Federal Rules of Evidence, its probative value was far outweighed by its unfairly prejudicial effect on the jury.
 
 
 39
 Turbomeca submits that where, as here, an experiment is offered to illustrate physical principles and not to simulate the actual event, the experiment results should be admitted into evidence. It claims that the information contained in the videotape is neither confusing nor prejudicial, and that the court could have given a limiting instruction to overcome any potential confusion. Turbomeca asserts that the exclusion of this evidence constituted an abuse of discretion by the district court. Harvey v. General Motors Corp., 873 F.2d 1343, 1355 (10th Cir.1989); Bannister v. Town of Noble, Okla., 812 F.2d 1265, 1270-72 (10th Cir.1987).
 
 
 40
 "A trial court's evidentiary rulings are reviewed for an abuse of discretion, (citation omitted), as are its decisions on instructing the jury (citation omitted)." Durtsche v. American Colloid Co., 958 F.2d 1007, 1011 (10th Cir.1992). The admissibility of experiments is discretionary, and a ruling on admissibility will only be disturbed on appeal if it is clearly erroneous--a clear abuse of discretion. Jackson v. Fletcher, 647 F.2d 1020, 1026 (10th Cir.1981); Bannister, 812 F.2d at 1270. Admissibility of experimental evidence does not depend on identical actual and experimental conditions. Typically, dissimilarities go to the weight of the evidence rather than its admissibility. Champeau v. Fruehauf Corp., 814 F.2d 1271, 1278 (8th Cir.1987) (citing Randall v. Warnaco, Inc., 677 F.2d 1226, 1233-34 (8th Cir.1982)). When ruling under Fed.R.Evid. 403, the task of balancing the probative value of evidence against the harm likely to result from its admission is well-suited for the trial judge who is familiar with the full scope of the evidence. C.A. Assocs. v. Dow Chemical Co., 918 F.2d 1485, 1489 (10th Cir.1990).
 
 
 41
 Experiments purporting to simulate actual events may be admissible if made under conditions which are substantially similar to those which are the subject of the litigation. While the conditions need not be identical, they must be sufficiently similar to provide a fair comparison. Jackson v. Fletcher, 647 F.2d 1020, 1027 (10th Cir.1981). In Jackson, the experiment was designed as a reenactment. We held that since a substantial dissimilarity in conditions prevented a fair comparison and could have misled the jury on a critical element of the case, the admission of the evidence was prejudicial. Id. at 1028.
 
 
 42
 On the other hand, filmed evidence which is not meant to depict the actual event may be admitted to show mechanical principles, "upon a showing that 'the experiment [was] conducted under conditions that were at least similar to those which existed at the time of the accident.' " Bannister, 812 F.2d at 1270 (citing Brandt v. French, 638 F.2d 209, 212 (10th Cir.1981)). However, if the evidence is offered to merely show physical principles, the experiment should be conducted without suggesting that it simulates actual events. Jackson, 647 F.2d at 1027. Experiments used to simply demonstrate the principles used in forming expert opinion need not strictly adhere to the facts. Brandt, 638 F.2d at 212. It is important then that the jury be instructed that the evidence is admitted for a limited purpose only. Id.; see also Millers' Natl. Ins. Co. v. Wichita Flour Mills Co., 257 F.2d 93, 97 (10th Cir.1958).
 
 
 43
 At trial, Turbomeca attempted to maintain both positions, arguing that the experiment had sufficient similarity to pass the substantial similarity test, and that it could also be admitted to show physical principles. The district court disagreed, finding that the experiment could not pass the substantial similarity test because it did not "come close enough to the elements of what happened in this situation." The court also noted that the experiment attempted to mock engine conditions to an extent that its admission would have confused the jury into thinking it was a reenactment, thereby precluding its admission. According to the court, Turbomeca's attempted recreation of the incident under controlled conditions at its own plant was "far better than the out-of-court experiment" conducted by Manning.
 
 
 44
 In the instant case, Manning's experiment was not being offered simply to show physical principles such as coefficient of friction. Instead, it was being offered to demonstrate what Manning believed occurred in the helicopter engine. Manning used the experiment to counter plaintiffs' theory by asserting that an 800 horsepower engine would not be affected by the screw-impeller contact when a three horsepower lathe was unaffected. Taken together, we hold that the district court did not abuse its discretion in excluding the experiment after determining that the conditions present in the out-of-court experiment were not substantially similar to those present at the time of the accident.
 
 IV. PROPERTY VERSUS ECONOMIC LOSSES
 
 45
 Turbomeca contends that the district court erred in permitting recovery of economic damages under the plaintiffs' strict liability theory.
 
 
 46
 In returning a verdict for Four Corners on its strict liability claim only, the jury awarded Four Corners $226,500 for the loss of the helicopter and $17,500 for the loss of the air compressor. The jury did not award damages for Four Corners' loss of use of the helicopter, loss of business income, loss of business opportunity, or other direct and consequential damages.
 
 
 47
 Turbomeca asserts that Four Corners' loss of the aircraft is a business loss and that the jury improperly awarded purely economic damages under Four Corners' strict liability theory. It claims that because Four Corners is a commercial user which lost the value of its product, Four Corners should be limited to a cause of action under warranty rather than strict liability.
 
 
 48
 Turbomeca cites East River S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) for the proposition that a commercial plaintiff's damages for economic losses are not recoverable in a strict liability action. The Court in East River emphasized the need to keep products liability and contract law separate, and indicated that "loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain--traditionally the core concern of contract law." Id. 476 U.S. at 870, 106 S.Ct. at 2302. Turbomeca contends that Colorado follows the East River rationale in that "a commercial buyer seeking damages for economic losses resulting from the purchase of defective goods may recover under the U.C.C., but not in strict liability." Richard O'Brien Cos. v. Challenge-Cook Bros., Inc., 672 F.Supp. 466, 472 (D.Colo.1987).
 
 
 49
 As a federal court sitting in diversity, we are required to apply Colorado law. Adams-Arapahoe School Dist. No. 28-J v. GAF Corp., 959 F.2d 868, 870 (10th Cir.1992). Contrary to Turbomeca's contention, Colorado law does not support the East River decision. In Richard O'Brien Cos., the federal district court simply attempted to interpret Colorado's application of Restatement § 402A.
 
 
 50
 In Hiigel v. General Motors Corp., 190 Colo. 57, 544 P.2d 983 (1975), the Colorado Supreme Court adopted § 402A of the Restatement (Second) of Torts. Section 402A provides that damage to a product itself is covered under the doctrine of strict liability. The court in Hiigel, however, "decline[d] to extend the doctrine of 402A to commercial or business loss," and thereby limited application of the Restatement to " 'physical harm ... caused to the ultimate user or consumer, or to his property....' " Hiigel, 544 P.2d at 989 (citing Seely v. Shite Motor Co., 45 Cal.Rptr. 17, 403 P.2d 145 (1965)). Relying on Hiigel, the Colorado Court of Appeals then "inferred that 'commercial or business losses' [meant] lost profits or loss of the benefit of a bargain." Aetna Casualty & Surety Co. v. Crissy Fowler Lumber Co., 687 P.2d 514 (Colo.Ct.App.1984).
 
 
 51
 In an effort to square Colorado's Hiigel decision with East River, the court in Richard O'Brien Cos. restricted Hiigel to its particular facts. The court distinguished between commercial and noncommercial cases, indicating that Hiigel involved a noncommercial plaintiff, and it subsequently held that "[p]laintiffs may not claim damages for injury to a product itself in tort pursuant to a commercial transaction." Richard O'Brien Cos., 672 F.Supp. at 472.
 
 
 52
 The instant case does not fall within the purview of the East River decision. As the Ninth Circuit has indicated, East River holds "that a cause of action for breach of warranty, not a products liability claim, lies for damage to a defective product, unless damage is caused to persons or property other than the product itself." Bancorp Leasing & Fin. Corp. v. Agusta Aviation Corp., 813 F.2d 272, 277 (9th Cir.1987) (emphasis added) (citing East River, 476 U.S. 858, 866-74, 106 S.Ct. 2295, 2300-04 (1986)). This court has similarly discussed East River, indicating that "the Supreme Court stated that whether an action is couched in terms of negligence or strict liability, no products liability claim lies in admiralty when a commercial party alleges injury only to the product itself resulting in purely economic loss." Lutz Farms v. Asgrow Seed Co., 948 F.2d 638, 643 (10th Cir.1991) (emphasis added).
 
 
 53
 Here, the defective engine was not purchased by Four Corners in a commercial transaction, and Four Corners is not seeking recovery for pure economic loss. Four Corners is a noncommercial plaintiff alleging injury to the product itself and the compressor being transported. We hold that, under applicable Colorado law, Four Corners is entitled to recover under strict liability for loss of the helicopter.
 
 V. PREJUDGMENT INTEREST
 
 54
 Turbomeca asserts that the district court erred in awarding prejudgment interest on future damages which were valued as of the date of trial, resulting in a duplication of damages.
 
 
 55
 Plaintiff Paton's economist, in evaluating Paton's net pecuniary loss, discounted the future damages to their present value as of the date of trial. The jury returned a verdict for $692,100, and the district court, under Colo.Rev.Stat. § 13-21-101(1), applied prejudgment interest to the entire award. Turbomeca agrees that the statute allows prejudgment interest on future damages; however, it asserts that the district court erred in awarding prejudgment interest to future losses which were discounted back only to the date of trial. Turbomeca argues that future damages must be properly discounted to the time at which the cause of action arose, in this case, the date of decedent's death.
 
 
 56
 Turbomeca claims that to award prejudgment interest on future damages discounted only to the date of trial permits a duplication of interest. Turbomeca relies on Woodling v. Garrett Corp., 813 F.2d 543 (2d Cir.1987), in which the court held that "[i]f the award of damages for losses that have yet to occur is not discounted for that earlier period from the date of death to date of decision, then an award of interest for that earlier period would not compensate any loss but would give plaintiff a windfall." Id. at 560.
 
 
 57
 Section 13-21-101 provides that for actions brought after July 1, 1979, "it is lawful for the plaintiff in the complaint to claim interest on the damages claimed from the date the action accrued." The Colorado Court of Appeals has "interpret[ed] this statute to mean that if interest is claimed from the date the action accrued, the trial court must calculate interest from that date." Smith v. JBJ, Ltd., 694 P.2d 352, 354 (Colo.Ct.App.1984) (emphasis added). The statute is ministerial in nature, providing that "[w]hen such interest is so claimed, it is the duty of the court in entering judgment for the plaintiff ... to add to the amount of damages assessed by the verdict of the jury ... interest on such amount...." (Emphasis added).
 
 
 58
 In the instant case, plaintiffs claimed interest from the date the action accrued. The district court, in accordance with its duty under section 13-21-101, awarded interest "to the amount of damages assessed by the verdict of the jury."
 
 
 59
 Turbomeca's only challenge concerns the discounting of future damages back to the date of trial instead of back to the date the action accrued. However, Turbomeca has referenced no Colorado case law supportive of this position. Moreover, nothing in section 13-21-101 dictates the date to which future losses must be discounted. Under these circumstances, we hold that plaintiffs are entitled to prejudgment interest on the entire jury verdict.
 
 
 60
 We AFFIRM.
 
 
 
 [1]
 An engine is "under power" when fuel is being delivered to it and it is producing 550 horsepower. An engine is not "under power" if it has been shut off and is winding down or is just being started with its electric starter motor